In re Thomas John PETERNEL, Sr. and Barbara Jean Peternel, Debtors.

WAYNE LUMBER COMPANY, Plaintiff,

v.

Thomas John PETERNEL, Sr., Defendant.

Bankruptcy No. 96–3303.

United States Bankruptcy Court, N.D. Ohio.

April 7, 1998.

---

Wayne Lumber Co., Toledo, OH, Louis J. Yoppolo, Toledo, OH, for plaintiff.

Thomas John Peternel, Sr., Maumee, OH, David P. Strup, Toledo, OH, for defendant.

### MEMORANDUM OPINION AND DECISION

RICHARD L. SPEER, Chief Judge.

This cause comes before the Court after Trial on Complaint to Determine the Dischargeability of Debt. At the Trial, the Court provided the parties the opportunity to file Post–Trial Briefs, which the parties have done. This Court has reviewed the arguments of counsel, exhibits, and the entire record in the case. Based upon that review, and for the following reasons, the Court finds that the debt at issue is dischargeable.

### FACTS

This case concerns certain alleged representations made by Defendant on behalf of Peternel Construction Company, Inc. (hereafter "Peternel Construction"), a closely held corporation under the laws of the State of Ohio, whose primary business was the construction of residential houses. Defendant was the president and, along with his wife, one of the two shareholders of Peternel Construction. Defendant maintained control of nearly all functions of the business including sales, marketing, checking on the progress of the work of the construction crews, and general management. Over time Peternel Construction built nearly two hundred fifty homes.

Plaintiff and Peternel Construction began doing business in the mid 1980's. Plaintiff supplied lumber for Peternel Construction's projects, and usually allowed Peternel Construction to purchase the lumber on credit, to be repaid as the project progressed. Gross sales from Plaintiff to Peternel Construction were approximately One Hundred and Fifty Thousand Dollars ($150,000.00) annually in the mid 1980's, and grew to Five Hundred Thousand Dollars ($500,000.00) in 1993, Six Hundred Thousand Dollars ($600,000.00) in 1994, and again Five Hundred Thousand Dollars ($500,000.00) in 1995. At the same time, the credit balance outstanding to Plaintiff grew over time. At the beginning of 1995 it was approximately Three Hundred Thousand Dollars ($300,000.00). At the conclusion of the year it grew to over Four Hundred and Fifty Thousand Dollars ($450,000.00).

According to Defendant, in 1995 Peternel Construction suffered significant losses due to an embezzlement by an employee entrusted with financial responsibilities. Defendant claims he was never able to determine how much money was stolen. Because of this, and a variety of other problems which appear to have stemmed in large part from a disregard for any accounting or financial discipline, Peternel Construction began suffering cash flow problems in 1995. By late 1995 numerous checks written on the Peternel Construction account were being returned due to insufficient funds, including checks Defendant wrote to himself. The record reveals that between December of 1995 and June of 1996 over eighty checks were returned due to insufficient funds. On July, 1, 1996, Defendant filed bankruptcy under Chapter 7 of the Bankruptcy Code.

In late 1995, Dale Harms, President and owner of Plaintiff, contacted Defendant concerning the growing credit balance of the Peternel Construction account. Mr. Harms

indicated that unless immediate arrangements were made to lower the balance, no further materials would be delivered to Peternel Construction. As a result of the communication, Mr. Harms was invited to meet with Defendant at the Peternel Construction office. Mr. Harms also testified that when he came to the meeting, he had expected that if he did not get paid, he would file mechanic's liens on the Peternel Construction job sites.

The meeting convened on December 12, 1995. Defendant told Mr. Harms that there were projects coming or underway from which he would be able to generate enough cash to reduce the balance of the debt, but that this could only happen if Mr. Harms did not cause the supply of materials to be cut off. That is, if Wayne did not supply materials to Peternel Construction, Peternel Construction would go out of business and not be able to pay the balance of its account. Defendant showed Mr. Harms specific cash projections, and Mr. Harms agreed to allow Peternel Construction the further use of material on credit. However, Mr. Harms did request and receive the names and phone numbers of specific bank employees who monitored the draws on the loans which would be used to fund the Peternel Construction projects.

Mr. Harms also claims that at the meeting Defendant told him that he had nothing to worry about because Defendant's mother-in-law was rich, and that if he needed to he could get money from her. Mr. Harms claims that he gave this promise particular credence because he understood that she was very rich. In August of 1995, she had pledged a One Hundred Thousand Dollar ($100,000.00) certificate of deposit to guarantee a loan for Peternel Construction.

On the same day as the meeting, Defendant sent Mr. Harms a letter memorializing the cash flow projections he expected to receive in the following thirty to forty days, and the payments he expected to make to Plaintiff therefrom. The letter details the cash Peternel Construction expected to receive from eleven projects, totaling Three Hundred Seventy-five Thousand Dollars ($375,000.00). It also states that of these receipts, at least One Hundred Thousand to One Hundred Twenty-five Thousand Dollars ($100,000.00 to $125,000.00) would go to Plaintiff by January 15th. The letter further states that there could be additional cash flow from the sale of "spec homes," which Peternel Construction owned. Finally, the letter states that rough draws on two specific projects will be paid to Plaintiff by December 29th, and that these draws would total Fifty-seven Thousand Three Hundred Eighty-three and 93/100 Dollars ($57,383.93).

Though Mr. Harms claims that he was adamant that he expected Peternel Construction to comply with these promises, when no payment was made by December 29th and January 15th as promised in the letter, Mr. Harms took no immediate action. Rather, Plaintiff continued to supply materials to Peternel Construction well past this deadline.

By early March of 1996, Mr. Harms complained to Defendant that he had not been paid on certain projects as promised. In response, Mr. Harms claims that Defendant delivered certain checks to him which he expressly said were written on sufficient funds. Two of these checks were dated March 22, 1996, in the amounts of Twenty-eight Thousand Forty and 70/100 Dollars ($28,040.70) and Twenty-two Thousand Fifty-three and 83/100 Dollars ($22,053.83). Defendant's testimony and a review of the Peternel Construction check register reveal that the checks were written on March 8th, and were post-dated. The other check, in the amount of Twenty-three Thousand Four Hundred Fifty-six and 45/100 Dollars ($23,456.45), appears to have been written and dated April 12, 1996.

Mr. Harms never attempted to cash these checks. He testified that he personally called the bank on which these checks were drawn on five or six occasions in an attempt to find a time when he could cash the checks on sufficient funds. Even if he had found such a time, it appears that his attempts still would have been in vain. A review of Peternel Construction's check register reveals that Defendant stopped payment on the checks dated March 22nd on or about March 27th. Defendant voided the check dated April 12th on or about May 15th.

Mr. Harms claims that after the December 12, 1995 meeting, and then after the issuance of the March and April checks, he refrained from bringing immediate suit and filing mechanic's liens, and from cutting off the flow of supplies to the Peternel Construction. According to Plaintiff's Peternel Account Activity Register, additional credit extended to Peternel Construction after the December meeting totaled Eighty-two Thousand Six Hundred Eighty-nine and 41/100 Dollars ($82,689.41). Payments were also made (with checks that cleared) totaling Fifty-eight Thousand Two Hundred Seven and 56/100 Dollars ($58,207.56), leaving a Twenty-four Thousand Four Hundred Eighty-one and 85/100 Dollar ($24,481.85) shortfall. Defendant points out that after the March 22nd bad checks, payments *exceeded* charges in the amount of Twenty-eight Thousand Two Hundred Seventy-two and 43/100 Dollars ($28,272.43).

Though Plaintiff claims that as a result of Defendant's representations at and after the December 12th meeting that it refrained from collection activities, Plaintiff has not shown, nor does it appear, that Plaintiff could have recovered any significant portion of its debt by pursuing these actions sooner.

A review of the deposits and checks written on the Peternel Construction account shows that rather than using the monies received on the various draws on the various projects to significantly pay down the past due balance owed to Plaintiff, Defendant used the monies to fund the continuing operations of his business. Such expenditures include paying employees and buying materials, equipment, and tools. Defendant continuously caused checks to be drawn upon the account in complete disregard of the actual balance in the account (causing the return of over eighty checks due to insufficient funds between December of 1995 and June of 1996). Also, a review of the Peternel Construction check register shows that there was scarcely a time between December of 1995 and June of 1996 when the account balance was not negative.

In mid May, Plaintiff finally took action and filed mechanic's liens on the various projects for which Plaintiff's materials had

been used. On July 1, 1996, Defendant filed bankruptcy. At the time the petition was filed, Peternel Construction had taken all or substantially all draws on several homeowner loans on several projects, but left the respective homes largely unfinished or in need of substantial repairs. The homeowner claims against Defendant have been adjudicated in separate adversary proceedings.

According to Plaintiff, at the time the bankruptcy petition was filed Peternel Construction owed Plaintiff Four Hundred Eighty-six Thousand Two Hundred Fifty-one Dollars ($486,251.00). With the exception of Thirty–Thousand Dollars ($30,000.00) recovered by Plaintiff in litigation outside the bankruptcy from certain financial institutions, Plaintiff has not recovered any of this money. However, counsel for Plaintiff and Defendant stipulated before trial that the balance presently due from Peternel Construction is Four Hundred Sixty-two Thousand Fourteen and 50/100 Dollars ($462,014.50).

Plaintiff has shown that before Peternel Construction would receive cash from draws on construction accounts, Defendant was required to sign an affidavit used in the industry which states that all subcontractors and materialmen have been paid to date. Mr. Harms did not see any such affidavit, however, and thus did not rely upon them. Indeed, he appears to have acknowledged and anticipated that after the December 12th meeting that draws were to be made on projects where he had not been paid to date.

### LAW

The Bankruptcy Code, 11 U.S.C. § 101 et. seq., provides in pertinent part:

**11 U.S.C. § 523. Exceptions to Discharge**

(a) A discharge under section 727, 1141, 1228[a] 1228(b), or 1328(b) of this section does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained, by—

(A) false pretenses, a false representation, or actual fraud, other than a

statement respecting the debtor's or an insider's financial condition.

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or in insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive[.]

## DISCUSSION

Determinations as to the dischargeability of particular debts are core proceedings pursuant to 28 U.S.C. § 157. Thus, this case is a core proceeding.

In its Complaint, the Plaintiff makes separate allegations under sections 523(a)(2)(A), 523(a)(2)(B), 523(a)(4) and 523(a)(6) of the Bankruptcy Code. In its Post–Trial Memorandum, Plaintiff has apparently abandoned the section 523(a)(4) and 523(a)(6) allegations, and has appropriately directed its allegations under § 523(a)(2), which is the most applicable provision to the facts of this case. Thus, Plaintiff's claim is that the debt at issue should be determined to be nondischargeable under § 523(a)(2).

As a preliminary matter, Plaintiff must show that despite the fact that the debt was between itself and Peternel Construction, and the fact that Defendant never agreed to be personally liable for the debt, Defendant should nevertheless be held liable. Plaintiff argues that Defendant can be liable for the damage caused by false representations he made on behalf of his company. That is, Plaintiff argues that the corporate veil can be pierced in this case. For the reasons that follow this Court finds it unnecessary to reach this issue, because the debt is dischargeable.

However, this Court will note that though the outstanding balance of the Peternel Construction debt is quite large, Defendant could only be personally liable to the extent Plaintiff can show that it has sustained an injury as a result of the alleged false representations. See *Belvedere Condominium Unit*

*Owners' Assn. v. R.E. Roark Cos., Inc.,* 67 Ohio St.3d 274, 289, 617 N.E.2d 1075, 1086 (1993) following *Bucyrus–Erie Co. v. Gen. Prod.,* 643 F.2d 413, 418 (6th Cir.1981) (Court adopts elements necessary to disregard corporate entity, and also mentions requirement that the shareholder's control of the corporation proximately caused the plaintiff's injury or loss); *Wiencek v. Atcole Co., Inc.,* 109 Ohio App.3d 240, 246, 671 N.E.2d 1339 (1996) (Evidence indicated that corporation's profits may have been so depleted by wrongful expenditures that it would prevent corporate creditor from receiving payment); *Barbee Concrete Construction v. Bachinski Builders, Inc.,* 1997 WL 723195 at *2 (Ohio App.) (Court found that sole shareholder's husband and president caused corporation to make a series of fraudulent transfers to members of shareholder's family which resulted in the corporation being unable to pay corporate creditor); *Alside Supply Co. v. Wager,* 89 Ohio App.3d 539, 542, 625 N.E.2d 647, 649–650 (1993) (third prong of test met because corporate creditor suffered an unjust loss of money due on its account with corporation because of the domination and control and wrongful acts of sole shareholder of corporation). Thus the amount of debt at issue appears to be only amount of credit extended after the alleged false representations, less subsequent payments. This amount is Twenty-four Thousand Four Hundred Eighty-one and 85/100 Dollars ($24,481.85) after the December meeting. After the March checks were issued, payments on the debt actually exceeded amount of material shipped.

Plaintiff argues that Defendant's assurances made at the December 12, 1995 meeting and thereafter render the debt owed to it nondischargeable. In particular, Plaintiff alleges that Defendant falsely represented that; (1) Three Hundred Seventy-five Thousand Dollars ($375,000.00) would be collected by Peternel Construction by January 12th, and that of this amount at least One Hundred Thousand to One Hundred Twenty-five Thousand Dollars ($100,000.00 – $125,000.00) would go to Plaintiff by January 15th; (2) that Plaintiff would get paid the rough draws collected on certain residences totaling Fifty-seven Thousand Three Hundred Eighty-

three and 93/100 Dollars ($57,383.93) by December 29th; (3) that Plaintiff would be paid the monies at issue from the jobs on which it was owed money and had lien rights from the draws at time they were drawn; (4) that payment was assured by Defendant's mother-in-law; and (5) that Defendant made representations that the checks he caused to be drawn on the .Peternel Construction account in March, payable to Plaintiff, were written on sufficient funds when in fact he knew they were not. The letter dated December 12th memorializes the first two of these representations. The only evidence of the other representations is Mr. Harm's testimony.

Section 523(a)(2) provides for two distinct claims of nondischargeability. Misstatements made concerning a debtor's financial condition are expressly excluded from § 523(a)(2)(A), and provided for in § 523(a)(2)(B). Section § 523(a)(2)(B) provides for the nondischargeability of misrepresentations concerning financial condition, but places a greater burden on the creditor than does § 523(a)(2)(A). First, the misstatement of financial condition must have been in writing, while § 523(a)(2)(A) does not have this requirement. Second, the creditor's reliance on the false representation of financial condition must have been "reasonable", while the Supreme Court has recently made clear than the creditor's reliance under § 523(a)(2)(A) need only be "justifiable", a less stringent standard. See *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995).

To the extend Plaintiff argues that the debt should be dischargeable based upon misstatements as to the financial condition of Peternel Construction, Plaintiff's argument fails under § 523(a)(2)(B). The only written statement of financial condition was the letter written on December 12th, and Plaintiff has not shown that these representations were false. Indeed, Plaintiff argues that Peternel Construction did have sufficient cash flows to pay it, but refused to do so. Rather, Plaintiff argues that this is compelling circumstantial evidence that Defendant never intended to pay as promised. These allegations, however, fall under § 523(a)(2)(A).

A creditor must prove five elements to show a debt is nondischargeable under § 523(a)(2)(A). These elements are: (1) the debtor made false representations, (2) the debtor knew such representations to be false at the time they were made, (3) the representations were made with the intent to deceive the creditor, (4) the creditor relied on the representations, and (5) the creditor's loss was the proximate result of the misrepresentation having been made. *In re Phillips*, 804 F.2d 930, 932 (6th Cir.1986); *In re Martin*, 761 F.2d 1163, 1165 (6th Cir.1985); *In re Bell*, 181 B.R. 311, 316 (Bankr. N.D.Ohio 1995); *In re Triplett*, 139 B.R. 687, 689 (Bankr.N.D.Ohio 1992). The creditor must show that its reliance on the debtor's representations was justifiable. *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). Justifiable reliance is a subjective standard that takes into account the qualities and characteristics of the particular creditor and the circumstances of the particular case. *Id.* The Plaintiff must sustain its burden by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

Courts have held that financial hardship alone is insufficient to support a conclusion that the debtor intended to defraud creditors. *In re Carrier*, 181 B.R. 742, 749 (Bankr.S.D.N.Y.1995). Rather, it has acknowledged that intent to deceive is a difficult element to establish, and although intent is generally inferred, courts have recognized "that misconceived optimism is not uncommon to the financially distressed." *In re Stewart*, 91 B.R. 489, 495 (Bankr.S.D.Iowa 1988) (quoting *Matter of Buford*, 25 B.R. 477, 482 (Bankr.S.D.N.Y.1982)). Indeed, it has been held that a mere promise to be executed in the future is not sufficient to make a debt nondischargeable, even though there is no excuse for the subsequent breach. *In re Barker*, 14 B.R. 852, 857 (Bankr.E.D.Tenn. 1981); *In Re Guy*, 101 B.R. 961, 978 (Bankr. N.D.Ind.1988). However, a misstatement made with gross recklessness as to the truth can render a debt nondischargeable under § 523(a). See *Phillips*, 804 F.2d at 934.

Plaintiff's primary argument is that the debt at issue should be determined nondis-

chargeable under § 523(a)(2)(A), because Defendant allegedly did not intend to make payments at the time he said he would, and because the Defendant made representations that the checks he wrote were good, knowingly that he could not honestly give this assurance. Plaintiff alleges that Defendant made these false representations to deceive Plaintiff into continuing to ship materials and forebear from collection activities. Plaintiff also notes that at a minimum the promises were made with gross recklessness, which is enough to render the debt nondischargeable per *Phillips.* 804 F.2d at 934.

Defendant argues that these were not false representations, and that he truly did intend to make payments as he projected. Defendant contends that the projections were just that, projections. He argues that for a variety of reasons Peternel Construction was simply unable to make the projected payments as he had hoped.

■ This Court does not find Defendant's explanation plausible. It is clear that at least as early as December of 1995 Defendant embarked upon a practice of making representations and writing checks which he either knew to be fraudulent, or was grossly reckless as to their falsity. Defendant had approximately nine checks returned for insufficient funds in December, one in January, and approximately eighteen in February. By June of 1996, shortly before bankruptcy was filed, the number of returned checks totaled over eighty. Further, at least as early as January of 1996 Defendant shamelessly intermingled funds of the various projects and continued to make draws on homeowners' loans with gross disregard for his company's financial ability to finish these projects. It is clear that Defendant simply chose to ignore the financial realities of his business. Considering this, this Court concludes that any statement he made as to his intent to pay was at least grossly reckless, and simply intended to coax creditors into reliance. Thus, this Court finds ample proof that false representations were made with the intent to defraud Plaintiff, as well as everyone else with whom Defendant was associated.

However, this Court also finds that Mr. Harms is not a novice to the construction business and was a supplier for Peternel Construction for many years. Mr. Harms can be charged with at least a minimal understanding of the practices of construction contractors and that of the Defendant himself. This Court finds Mr. Harms' inaction after the Defendant's various false representations to be evidence that he either did not actually believe what Defendant told him, or chose to forbear for reasons other than Defendant's representations. Specifically, though Mr. Harms argues that he relied upon the Defendant's representation that he would make certain payments by December 29th and January 15th, when no payment was received on these dates he did nothing until March. Even in March, he was satisfied with only checks which he knew were written on insufficient funds, as they were post dated. When there was no sufficient funds in the Peternel Construction account to cover these checks on the days they were dated, Plaintiff still did nothing. Rather, he took no action (other than continuing to check the checking account balance to try to find a time when they could be cashed) until the middle of May, when he finally began filing mechanic's liens.

Thus, Mr. Harms simply does not appear to have believed Defendant's representations as to when he would pay. Mr. Harms realized that Defendant was a slow payer. He also realized that any action he took would not result in any sizeable recovery considering the magnitude of the debt. However, he knew that if he took actions which put Peternel Construction out of business he would be nullifying any chance, however small, that he would recover the bulk of the debt. Also, if Defendant could have worked things out, he could have maintained a valued customer who contributed largely to Plaintiff's sales. Accordingly, this Court concludes that Mr. Harms did not in fact rely on Defendant's various representations, but simply chose to wait and see what would happen.

Nor is Plaintiff an innocent bystander to the havoc struck wreaked by Defendant through his corporation upon the homeowners who contracted with him. Putting

Peternel Construction out of business earlier would have prevented Defendant from making months worth of additional draws on projects which he could not complete, and driving up the balances on numerous homeowners' loans. Mr. Harms knew, and indeed hoped, that Defendant would use large portions of the draws not for the projects from which they were drawn, but to pay back debts. In effect, Plaintiff allowed the homeowners' money to be risked on Defendant's out-of-court reorganization attempt to salvage the possibility that its own debt might be repaid. This Court will not reward such behavior.

■ Accordingly, this Court finds that Plaintiff did not actually rely upon the false representations, and therefore has not shown that the debt at issue is nondischargeable under § 523(a). Regarding the reliance element of its cause of action, Plaintiff cites *In re Plechaty*, 213 B.R. 119 (6th Cir. BAP 1997), for the proposition that it need not prove specific damages. Plaintiff also cites that the recent Supreme Court case of *Field v. Mans*, cited supra, which lowered the requisite reliance from reasonable to justifiable. The *Plechaty* case does not discuss its holding, but simply adopts the reasoning of "the majority of cases," including *In re McFarland*, 84 F.3d 943, 947 (7th Cir.), *cert. denied*, — U.S. —, 117 S.Ct. 302, 136 L.Ed.2d 220 (1996); *In re Norris*, 70 F.3d 27, 29 n. 6 (5th Cir.1995); *In re Goodrich*, 999 F.2d 22, 26 (1st Cir.1993); *In re Gerlach*, 897 F.2d 1048, 1051 (10th Cir.1990). However, none of the cases purport to negate the element of *reliance in fact*, whether justifiable or otherwise. *Id.* Indeed, in each of these cases actual reliance was analyzed and found. *Plechaty*, 213 B.R. at 126; *McFarland*, 84 F.3d at 947; *Norris*, 70 F.3d at 30; *Goodrich*, 999 F.2d at 24–25; *Gerlach*, 897 F.2d at 1052. Overlooking the actual reliance requirement and would be in plain contravention of the language an intent of § 523(a). Section 523(a)(2) specifically provides that for the nondischargeability of extensions of credit, but only "to the extent obtained by" the misstatement. In this case, Plaintiff's actions show that it was not the Defendant's false representations which caused him to forebear from immediate collection activities. Rather, Plaintiff refrained as a result of Defendant's true representations that if Plaintiff caused Peternel Construction to go out of business, it would not be able to repay its debt. This Court does not have to reach the issue of whether the reliance was justifiable under § 523(a)(2)(A), or reasonable under § 523(a)(2)(B), as there simply was no reliance at all.

■ In a separate allegation, Plaintiff also points to the affidavits signed by Defendant to obtain draws from the bank as work progressed on numerous projects. These affidavits stated that there were no outstanding debts owed to materialmen or subcontractors, and were clearly false and fraudulent when signed. However, Plaintiff did not rely on these affidavits. Indeed, Mr. Harms did not even see them until after the bankruptcy was filed in July of 1996. Further, Mr. Harms knew or could have known at the meeting on December 12th, if he cared enough to think about it, that Defendant would be falsely signing these documents. Mr. Harms is familiar with the construction industry and is undoubtedly familiar with this procedure. He knew that the Defendant would be seeking draws in the future, and that Plaintiff had not been paid. Plaintiff certainly cannot prevail on the basis of these affidavits.

■ Finally, Plaintiff argues that Defendant should not have assured Plaintiff that Defendant's mother-in-law would help him out if Defendant did not have an absolute assurance from her that support would be forthcoming. There is no proof that such a representation was made other than Mr. Harm's memory. This Court is reluctant to base a decision solely on such a recollection. Further, it is difficult to believe that, absent a signed guarantee, Mr. Harms actually thought that the assistance of Defendant's mother-in-law would be anything other than a possibility. Had Mr. Harms really based his actions on her financial ability he would have required her signature. Why not just have her pay now? Rather, Mr. Harms did not even require Defendant's personal guarantee on the debt. Finally, such a reliance is not justifiable in this business setting.

In summary, Plaintiff was aware of Defendant's financial plight, and chose the risk of not pursing collection efforts immediately. Indeed, not only did Plaintiff choose to forebear from immediate collection activity, it chose to allow the Defendant's company additional credit for materials. The reason for this choice is clear. Had Plaintiff taken immediate steps to collect, he admittedly would have shut down the Defendant's business. Plaintiff has not shown, nor does it appear, that these efforts would have yielded any return at all, and it certainly would not have recovered the bulk of the debt owed (which totaled well over Four Hundred Thousand Dollars ($400,000.00)). However, by not beginning collection efforts immediately, the Plaintiff kept alive the possibility that Defendant could work through his problems and possibly repay the debt as the business revived. If the Defendant had been successful, not only would Plaintiff have recovered the debt owed, but would also have maintained a long-time customer who contributed largely to his gross sales. This Court finds Plaintiffs actions or inactions were not the result of any false representation by Defendant.

For all these reasons, this Court concludes that Plaintiff has failed to show that the debt at issue is nondischargeable pursuant to § 523(a)(2). Thus, the debt owed to Plaintiff (to the extent it is a personal debt of Defendant at all) is a dischargeable debt. In reaching the conclusion found herein, the Court has considered all of the evidence, exhibits and arguments of counsel, regardless of whether or not they are specifically referred to in this Opinion.

Accordingly, it is

*ORDERED* that to the extent that Defendant has any liability to Plaintiff, that liability is hereby determined to be *DISCHARGEABLE*.