**In re Lloyd W. KURTZ, Holly L. Kurtz, Debtors.**

**ADVANTA NATIONAL BANK, Plaintiff,**

**v.**

**Holly L. KURTZ, Defendant.**

**Bankruptcy No. 96–62460.**
**Adversary No. 96–70218A.**

United States Bankruptcy Court,
N.D. New York.

March 7, 1997.

Robert S. Cooper, Rochester, NY, for Advanta National Bank.

Goldberg & Fabiano, Syracuse, NY (Harold Goldberg, of counsel), for Debtor/Defendant.

MEMORANDUM–DECISION, FINDINGS
OF FACT, CONCLUSIONS OF LAW
AND ORDER

STEPHEN D. GERLING, Chief Judge.

The Court considers herein the adversary proceeding commenced on August 15, 1996, by Advanta National Bank ("Plaintiff") seeking a denial of dischargeability of a debt

incurred by Holly L. Kurtz ("Mrs. Kurtz" or "defendant") pursuant to § 523(a)(2)(A) of the Bankruptcy Code (11 U.S.C. §§ 101–1330) ("Code"). Issue was joined by filing of an Answer on September 9, 1996. Defendant's Answer contains a counterclaim for attorney's fees and costs based on the allegation that the Plaintiff was not substantially justified in commencing the adversary proceeding.[1] On September 25, 1996, Plaintiff filed its Reply asserting that the counterclaim failed to state a cause of action upon which relief could be granted.

The trial of the adversary proceeding was held on November 18, 1996. The Court heard testimony from Mrs. Kurtz and her husband, Lloyd W. Kurtz ("Mr. Kurtz") (hereinafter jointly referred to as "Debtors"), as well as from their bankruptcy attorney, William Weisberg, Esq. ("Weisberg").[2] In lieu of closing arguments, the parties were afforded an opportunity to file post-trial memoranda of law. The matter was submitted for decision on December 20, 1996.

## JURISDICTIONAL STATEMENT

The Court has core jurisdiction over the parties and subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 1334(b), 157(a), (b)(1), and (b)(2)(I).

## FACTS

On May 22, 1996, Debtors filed a voluntary petition ("Petition") pursuant to chapter 7 of the Code. See Plaintiff's Exhibit 1. Listed in Schedule F filed with the petition is $41,000 in unsecured claims, of which $39,500 appears to be credit card debt. The only other unsecured creditor is the New York State Electric & Gas Corporation, with a claim of $1,500. Plaintiff is listed as having a claim of approximately $6,000.

According to Schedule I filed with the Petition, Mr. Kurtz was earning approximately $1,789.06 per month after deductions at the time the Petition was filed. However, according to Mrs. Kurtz his employment actually ceased the end of April. Automatic deposits to their checking account by Mr. Kurtz's employer, Comforce Global, Inc. ("Comforce"), for the two month period prior to filing their Petition were as follows:

| DATE | AMOUNT |
|---|---|
| 3/14/96 | $507.21 |
| 3/21/96 | 405.17 |
| 3/28/96 | 624.45 |
| 4/4/96 | 416.02 |
| 4/18/96 | 844.29 |
| 4/25/96 | 705.52 |
| 5/2/96 | 526.15 |

See Plaintiff's Exhibits 2A and 2B.[3] According to Mrs. Kurtz, it was upon learning that her husband's employment was about to end that they decided to consult Weisberg on April 25, 1996.

Mrs. Kurtz testified that she was unemployed at the time Debtors filed their Petition. She also testified that she had not worked since the spring of 1995 due to problems with her pregnancy, which subsequently resulted in the birth of Debtors' second child in September 1995. It was her testimony that in March 1996, which was about the same time that she received the Plaintiff's offer for a credit card and accepted a $5,000 cash advance, she had intended to accept an offer from her former employer and return

---

1. Defendant contends that Plaintiff should have attended the meeting of creditors or should have sought to conduct a 2004 examination of Mrs. Kurtz.

2. At the close of the Plaintiff's case, a motion was made on behalf of the defendant, Mrs. Kurtz, to dismiss the complaint, asserting that Plaintiff had failed to meet its burden of proof. The Court reserved decision on the motion.

3. Exhibits 2A and 2B were attached to Amended Response to Plaintiff's First Document Request, identified as Plaintiff's Exhibit 2. Upon objection by Mrs. Kurtz's counsel to the admission of Plaintiff's Exhibit 2, as well as to Plaintiff's Exhibits 3 (Defendant's Response to First Docu-

ment Request), 4 (Defendant's Response to Interrogatories) and 5 (Defendant's Response to Request for Admissions), the Court reserved decision on whether to admit the exhibits without proffer of proof or the testimony of a witness. Certain documents were redacted from the Exhibits, however, and admitted into evidence without objection (Plaintiff's Exhibits 2A, B, C and D and 3A, B and C). In its Memorandum of Law, filed December 20, 1996, Plaintiff indicates that it will not be necessary for the Court to render a decision concerning the admissibility of Exhibits 2 and 3 since the redacted documents appended to them were admitted into evidence on the day of the trial.

to work. However, she decided not to take the position after discovering that upon deducting the cost for child care for two children and transportation she would have netted only $10.00 per week.

At the time they filed their Petition, Debtors listed monthly expenses of $2,115.99. *See* Schedule J of Plaintiff's Exhibit 1. Mrs. Kurtz testified that $50 per month, which was deducted automatically from Debtors' checking account to pay for two student loans had not been included in Schedule J. Both Debtors also testified that prior to filing their Petition they had been paying approximately $100 per month on each of 9–10 credit cards in an effort to reduce the balances on the accounts. Mrs. Kurtz admitted that for the most part the balances were probably within $1,000 of the credit limit on each.

According to the Debtors' tax returns for 1992, 1994 and 1995, their income totaled $20,233, $48,528 [4], and $21,199 respectively. The Debtors testified that prior to moving to New York in June 1995, they had resided in California. Mr. Kurtz testified that he had accepted a job with Comforce installing "cell sites." He also testified that since moving to New York, he had been looking for a "real job" which would not require that he travel. It was Mr. Kurtz's testimony that he had hoped to be able to obtain a position with Cellular One which allegedly would have paid him a salary of $37,000 per year, in addition to overtime and evening work; however, the position never became available to him. He testified that his job with Comforce ended the latter part of April and he was unemployed for two months until taking a job in Massachusetts in June of 1996.

Mrs. Kurtz testified that she had had numerous credit cards since she was sixteen years old. In approximately 1993 she estimated that she and her husband had approximately 7–8 credit cards with a total balance due on them in excess of $20,000. It was also her testimony that the $41,000 of debt listed in the Petition had been incurred over a period of ten years and that they had owed approximately that amount of money for two to three years prepetition. Some of the debt had been incurred by her prior to Debtors' marriage approximately five years ago. This included the $1,500 owed to New York State Gas & Electric, which she indicated she had incurred when she was between 16 and 20 years of age.

According to Mrs. Kurtz, over the years it had been her practice to pay the minimum monthly payments on the various credit card accounts. During the six months prior to filing their Petition things had been going well for them. Since Mr. Kurtz was earning overtime pay on a regular basis, they had been able to begin to pay more than the minimum balances on the credit cards. Mrs. Kurtz indicated that payments were generally being made in the amount of $100 on each account in the hope of being able to reduce the principal balances on the cards. She testified that they had continued to pay on their credit card account debt until the money ran out. Mrs. Kurtz identified $810 in checks (# 352, 354, 355, 356, 357, 358 and 363) listed on Debtors' checking account statement for the period from March 14 to April 11, 1996, which she believed had been paid on credit card accounts. *See* Plaintiff's Exhibit 2A. There was also a payment of $100 (check # 385) which was posted to their account on May 10, 1996, and two other checks (# 380 and # 383) listed on the statement for the period from April 12 to May 13, 1996, which she believed represented minimum payments on two other credit card accounts. Mr. Kurtz testified that if he had continued to work, the Debtors would have continued to pay on their various credit card accounts. However, on the advice of counsel they had ceased making any further payments.

Mrs. Kurtz testified that over the six months prior to filing their Petition she generally received one or two credit card solicitations per month. Her decision to accept the offers was generally based on the rate of interest charged. It was her testimony that in March 1996 she received a letter from the Plaintiff notifying her that she had been pre-

---

4. This included $8,069 in salary, $459 in unemployment compensation, $30,000 in capital gains and $10,000 in income received from Mr. Kurtz's father. Mrs. Kurtz testified that the Debtors had never actually received $30,000.

approved for a credit card and all she needed to do was to return the enclosed postcard or call an "800" number. She called the "800" number and was asked to identify herself by her name and the identification number listed on the card. There were no questions concerning the Debtors' employment status and no specific questions about any other credit card debt. She testified that there was some suggestion that she might wish to use the monies to pay other bills. She testified that she accepted the offer, and the initial $5,000 was deposited directly into the Debtors' checking account. It was her testimony that she had never before received an offer of a $5,000 cash advance. Previously, the highest amount approved in her name had been $1,000 in cash advances.

When asked if she understood that in accepting the credit card she was obligated to repay any charges or cash advances, she stated, "Of course. A credit card is a credit card." She also testified that she had never defaulted or been sued on any of the numerous credit card accounts she had had over the years.

Mr. Kurtz described the $5,000 cash advance as a "windfall" and acknowledged that at that point in March 1996 things were "looking good" and they decided to "splurge".[5] However, he also testified that he knew his job with Comforce "might be over" in April 1996.

## DISCUSSION

### Admissibility of Admissions in Response to a Request for Admissions and Answers to Interrogatories

[I]nterrogatories and requests for admissions are not interchangeable procedures designed for the same purpose. Requests for admissions are designed to eliminate from the case issues which are not really in dispute between the parties, and thus to limit the case to the vital and disputed issues. Interrogatories, on the other hand, are designed to elicit relevant information which, although itself inadmissible, "appears reasonably calculated to lead to the discovery of admissible evidence."

*People v. The Jules Fribourg*, 19 F.R.D. 432, 434–35 (N.D.Cal.1955).

Rule 36(b) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P."), incorporated by reference in Rule 7036 of the Federal Rules of Bankruptcy Procedure ("Fed.R.Bankr. P."), provides that "[a]ny matter admitted under this rule is conclusively established unless the court on motion permits withdrawal or amendment of the admission." In this case, there has been no motion to either withdraw or amend any of the admissions made by Mrs. Kurtz. Therefore, the Court concludes that Plaintiffs Exhibit 5 is admitted into evidence for purposes of apprising the Court of the issues that are not in dispute. These include the following admissions:

Mrs. Kurtz admits that she previously received from the Plaintiff the original or a copy of the documents or exhibits attached to the Plaintiff's Complaint. These include statements for Account # 4326835202064380 ("Account") which show a balance of $5,964.06 as of March 26, 1996, a balance of $6,045.86 as of April 24, 1996, and a balance of $6,126.31 as of May 23, 1996. The March 25th statement shows cash advances made between March 7 and March 20, 1996, totaling $5,800 and a purchase of $111.62 on March 22, 1996. There are no purchases or cash advances listed on either the April 24th statement or the May 23rd statement.

She also admits that the three credit card statements accurately reflect the transactions in her Account with the Plaintiff. She admits that she was in possession of the Account at all times. She also acknowledges that as of March 7, 1996, when the $5,000 cash advance was made, she had in excess of $30,000 in unsecured debt.

In her response to Request for Admission No. 4, Mrs. Kurtz admits that she was in default on the "other debts as of the first date set forth in Paragraph 5 of Plaintiff's Complaint", which is March 7, 1996. She did

---

**5.** This included losing approximately $3,000 of the money gambling at the Turning Stone Casino in nearby Verona, New York.

not admit to having $30,000 in other unsecured debt until Request for Admission No. 8. Therefore, it is not clear to the Court what the "other debts" are that are referenced in the statement and, therefore, it will not consider that admission.

Fed.R.Civ.P. 33(c), which is incorporated by reference in Fed.R.Bankr.P. 7033, provides that answers to interrogatories may be used to the extent permitted by the rules of evidence. In order to be considered by the Court the answers must have been offered into evidence. *See In re McLeod,* 176 B.R. 455, 457 (Bankr.N.D.Ohio 1994) (citations omitted). In the matter *sub judice,* Plaintiff's counsel offered Exhibit 4 into evidence. Counsel for Mrs. Kurtz raised a general objection to its admissibility. As Plaintiff correctly points out in its Memorandum of Law, no objection based on relevancy, prejudice, hearsay, truth, veracity, or authenticity was raised by defendant's counsel at trial. However, within the answers to a portion of Interrogatory 14, which sought information concerning third parties with whom the Debtors may have talked concerning filing a bankruptcy petition, Mrs. Kurtz did object to its relevancy. With respect to Interrogatory 15 seeking information concerning Debtors' initial meeting with Weisberg and the payment of his fees, Mrs. Kurtz, while responding with the requested information, reserved her right to assert the attorney/client privilege.

In the absence of any specific objections, the Court will admit the answers to Interrogatories 1–13 and that portion of 14 which indicates that Mrs. Kurtz first considered filing bankruptcy on or about April 25, 1996, following the layoff of her husband. The Court sustains the objection to the remainder of Interrogatory 14, concluding that identification of third parties with whom the Debtors discussed the possibility of filing a bankruptcy petition is not relevant to the matter herein. With respect to Interrogatory 15 concerning Debtors' contact with Weisberg and the fee for his services, the Court need not rule on its admissibility since the same information was elicited at trial, and copies of the receipts from Weisberg to the Debtors in connection with payment of his fees were admitted into evidence (*see* Plaintiff's Exhibit 2C).

**Dischargeability Analysis Pursuant to Code § 523(a)(2)(A)**

Code § 523(a)(2)(A) provides an exception to the discharge of a debt for money, property or services to the extent obtained by "false pretenses, a false representation, or actual fraud, other than a statement concerning the debtor's financial condition." In order to effectuate the fresh start purpose of the Code, such exceptions to discharge of a debt are to be strictly construed against the creditor and liberally in favor of the honest but unfortunate debtor. *See MBNA America v. Parkhurst (In re Parkhurst),* 202 B.R. 816, 820 (Bankr.N.D.N.Y.1996). The burden is on the petitioning creditor to establish by a preponderance of the evidence that the particular debt should not be discharged. *See id. (citing Grogan v. Garner,* 498 U.S. 279, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991)).

With respect to credit card debt, the establishment of the traditional elements of fraud, namely false representation, intent to deceive, reliance and damages, is somewhat problematic for the credit card issuer when the credit card transaction involves the purchase of goods or services for which the credit card issuer has no direct involvement. *See id.* at 821. The same is true when the monies are advanced through the use of an automatic teller machine ("ATM"). In both instances, the cardholder has not directly represented anything to the issuer of the credit card at the time of the transaction. *See id.* (citations omitted). To resolve this problem, most courts have adopted a modified approach referred to as the "implied representation doctrine." *See id.,* citing *In re Leventhal,* 194 B.R. 26, 29 (Bankr. S.D.N.Y.1996). Under this approach, the courts examine whether at the time the card was used the debtor had the intent to repay the debt and reasonably believed in his or her ability to do so. *See id.* The fact that a debtor's credit card obligations may have exceeded his or her income at the time the charges were incurred does not per se sustain non-dischargeability. *See id* at 821–22 (citations omitted). In *Parkhurst* the Court noted that "one should not imply any repre-

sentation on the debtor's part concerning his/her ability to pay at the time the card was used." *Id.* at 822 (citations omitted).[6]

■ In the matter *sub judice*, it is necessary for the Court to bifurcate its analysis as the "implied representation doctrine" is only applicable to a portion of the debt which Plaintiff seeks to have determined to be non-dischargeable. According to Mrs. Kurtz's testimony, the initial cash advance of $5,000 was deposited directly into Debtors' checking account following her conversation with Plaintiff's representative. Not only was Mrs. Kurtz approved for a credit card with a credit limit of $6,000, she actually received a $5,000 advance as a result of her conversation with Plaintiff's representative. There was no need for Mrs. Kurtz to use an ATM to access the monies. The debt was incurred upon the deposit of the $5,000 by the Plaintiff into the Debtors' checking account. Unlike the situation in which the cash advance was obtained using an ATM in which there is no direct involvement of the credit card issuer in the transaction at the time it occurred, in this case, Mrs. Kurtz dealt directly with Plaintiff's representative over the telephone. Plaintiff's representative had every opportunity to inquire concerning the employment status of either Mrs. Kurtz or her husband at the time and the extent of other credit card debt in her name or that of her husband. Instead, all Mrs. Kurtz was asked was her name and the identification number appearing on the offer of pre-approved credit. In exchange for that information, she was advanced $5,000. The Plaintiff has offered no proof that when it advanced the $5,000 to Mrs. Kurtz any of her representations made to its representative over the telephone were in any way false. How she later used the $5,000 need not concern the Court since any use occurred after the monies were deposited and the debt incurred. Furthermore, the Court need not apply the "implied representation doctrine" to the transaction since there were *actual* representations made directly to Plaintiff's representative. The fact that the representative failed to inquire concerning

Debtor's ability and intent to repay the $5,000 at the time that the advance was made and arguably relied on her past payment history on other credit card accounts does not support Plaintiff's position that there is a basis for denying the Debtors a discharge of the debt incurred in connection with the $5,000 advanced to Mrs. Kurtz on or about March 7, 1996.

■ The cash advances of $400 each, taken out on March 18, 1996, and March 20, 1996, and the purchase made on March 22, 1996, in the amount of $111.62, did not involve any direct representations on the part of Mrs. Kurtz to the Plaintiff at the time of those transactions. Therefore, it is appropriate to analyze them using the "implied representation doctrine." In this regard, Plaintiff must establish by a preponderance of the evidence that Mrs. Kurtz "knew full well that any professed intention to repay was false or was known by the debtor not to be well-grounded, and that ... she nonetheless deliberately used the card ..." *See In re Shanahan,* 151 B.R. 44, 47 (Bankr.W.D.N.Y.1993); *see also In re Murphy,* 190 B.R. 327, 333–34 (Bankr.N.D.Ill.1995) (stating that the question is "whether all the evidence leads to the conclusion that it is more probable than not that the debtor had the requisite fraudulent intent."). In determining Mrs. Kurtz's intent at the time the charges were incurred, the Court must give consideration to the evidence presented at trial with particular attention to the testimony elicited by Plaintiff's counsel.

■ According to Mrs. Kurtz's own testimony, she has had the use of various credit cards since she was sixteen years old. Over the ensuing twelve years, she testified that she had never defaulted on any of her credit card obligations. She apparently was careful to make the required minimum monthly payments, and when finances permitted, there were efforts made to reduce the balances by making more than the required minimum payment. In 1993 she testified that the Debtors owed approximately $20,000 on 7–8 different credit cards, and that at the time

---

**6.** This is based on the view that if one had the ability to pay, arguably there would be no need    to rely on credit!

the Petition was filed their debt had escalated to almost $41,000. Mr. Kurtz testified that if he had not lost his job and been unable to find other employment immediately thereafter, they would have made the payments on the obligation to the Plaintiff as had been their practice on all their other credit cards over the past several years. Indeed, Mrs. Kurtz acknowledged her responsibility for any debt incurred on the Account, stating, "A credit card is a credit card."

According to Mrs. Kurtz, at the time the advances and the purchase were made using the credit card issued to her by Plaintiff, she had every intent of returning to work. Although the Debtors knew that Mr. Kurtz's job might be over in April 1996, this was not confirmed until sometime in the latter part of April. Mr. Kurtz testified that he had hoped to obtain a position with the contractor of the project on which he was working, Cellular One, but the company allegedly decided to downsize.

According to the March 25th statement on the Account, payment of $112.00 was due on April 19, 1996, six days prior to meeting with Weisberg. Mrs. Kurtz acknowledged that no payment had been made on the Account because at that point they had simply run out of money as a result of her husband's unemployment. At the same time, Mrs. Kurtz identified several checks *posted* to Debtors' checking account during the period between March 14, 1996, and May 13, 1996, which represented payments on their various credit card accounts around the time Mr. Kurtz lost of his job.[7] The Court finds nothing in the evidence that convinces it that Mrs. Kurtz did not intend to pay back the advances of $800 and the purchase of $111.62 made between March 18, 1996, and March 22, 1996. Based on the Debtors' past payment practices, it is evident that the intent was certainly not to pay off the balances in full on their credit card accounts but simply to make the required minimum monthly payments as allowed under agreements such as Mrs. Kurtz had with the Plaintiff. Whether or not the Court agrees with this practice, it is certainly one that has been encouraged by credit card companies such as Plaintiff's. As long as credit card holders are willing to make minimum monthly payments, their lines of credit are increased and they continue to receive additional offers of pre-approved credit based on the fact they have not defaulted on those monthly payments.

Having concluded that Plaintiff has failed to establish that Mrs. Kurtz did not intend to repay the $800 in cash advances and the purchase of $111.62, the Court need not address whether the Plaintiff justifiably relied on the representations of Mrs. Kurtz at the time of those transactions.

## Counterclaim for Attorney's Fees and Costs

Although no reference is made in defendant's counterclaim to any statutory basis for its request of attorney's fees and costs, the Court will treat the request as one based on Code § 523(d). In order to prevail on a motion pursuant to Code § 523(d), defendant must establish (1) the Plaintiff sought a determination of the dischargeability of a debt pursuant to Code § 523(a)(2), (2) the debt is a consumer debt, and (3) the debt was discharged. *See In re Schalk*, 191 B.R. 522, 528 (Bankr.N.D.N.Y.1995) (citations omitted). Once these have been established, the Plaintiff has the burden of proving that its actions were substantially justified. *See id.* (citations omitted).

It is clear that Plaintiff's Complaint was based on Code § 523(a)(2). Furthermore, Mrs. Kurtz testified that the advances were used for car repairs, dental services, tires and other normal living expenses. In addition, there was $3,000 in gambling losses. All of these are considered to be consumer debt. Finally, as discussed above, the Court has concluded that the debt owed to Plaintiff is dischargeable. Therefore, the question is whether Plaintiff was substantially justified in commencing this adversary proceeding.

Defendant's counsel contends that Plaintiff should have participated in the meeting of

---

7. Apparently, the Debtors were unable to provide Plaintiff with copies of the checks in order to determine when they were issued and endorsed. Mrs. Kurtz testified, however, that the Debtors continued to pay on their credit card accounts until the money ran out and they decided to consult Weisberg.

creditors or requested a 2004 examination of Mrs. Kurtz. Plaintiff did conduct discovery of Mrs. Kurtz in the form of requests for production of documents, interrogatories and requests for admissions. However, this occurred subsequent to the filing of the Complaint. Apparently, its allegations were based primarily on the information in the Petition and its Account statements. The timing of the advances and purchase, the last of which occurred sixty days prior to the filing of the Petition, certainly formed a reasonable basis for concern that Mrs. Kurtz never intended to repay the debt. The fact that the Debtors' Schedules revealed $41,000 in mostly unsecured credit card debt at the time they filed their Petition and the lack of any disposable income also provided further justification for Plaintiff's Complaint, in the opinion of the Court. Therefore, the Court will deny defendant's counterclaim.

Based on the foregoing, it is hereby

ORDERED that Plaintiff's Exhibits 4 and 5 are admitted into evidence to the extent discussed in the Decision herein, and it is

ORDERED that the relief sought in the Plaintiff's Complaint with respect to a determination of nondischargeability of the debt owed to it pursuant to Code § 523(a)(2)(A) is denied; it is further

ORDERED that the motion made on behalf of defendant to dismiss the Complaint is granted; and it is further

ORDERED that defendant's counterclaim seeking attorney's fees and costs pursuant to Code § 523(d) is denied.