In re Gene A. **MILLER**, Debtor.

**Universal Card Services f/k/a AT & T Universal Card Services, Plaintiff,**

v.

**Gene A. Miller, Defendant.**

**Bankruptcy No. 98–42486.**
**Adversary No. 98–4161.**

United States Bankruptcy Court, W.D. Missouri.

Dec. 23, 1998.

238

Daniel S. Rabin, for plaintiff.

Max Jevinsky, for debtor.

Janice Stanton, Trustee.

### ORDER

FRANK W. KOGER, Chief Judge.

Universal Card Services filed a Complaint to Determine Dischargeability in the above-captioned bankruptcy case, requesting that the debt owed to it by Debtor Gene A. Miller be declared nondischargeable under 11 U.S.C. § 523(a)(2)(A) and (B). The debtor answered and requested attorney's fees under § 523(d). The matter came to trial on December 2, 1998, and the Court hereby issues the following Findings of Fact and Conclusions of Law as required under Fed. R.Bankr.P. 7052.

The evidence at trial showed that on October 26, 1993, Miller responded to AT & T Universal Card Services' pre-approved credit card offer by returning a card on which he had filled in his name, income, social security number, date of birth, telephone numbers, and mother's maiden name. The response card indicated that Miller had been pre-approved for a credit line in the amount of $6,000.00. Miller used the card off and on over the next several years and with perhaps one or two exceptions, he made payments in a timely manner and he sometimes had a credit balance on the account.

On January 24, 1998, Miller had a credit balance on the account in the amount of $63.75. This credit balance was the result of Miller's making a payment to Universal in the amount of $3,554.08 on January 12, 1998, by a check drawn against an account with Chase Manhattan Bank. The check appears to be a convenience or cash advance check of the type offered by credit card companies to its customers so they can use them, often at lower interest rates, to pay off other credit cards or other debts.

The next statement, dated February 24, reflected $107.05 in charges, no payments, and no cash advances. The March 24 statement showed a $3,000 cash advance against the account, $1,138.01 in charges, and $29.18 in finance charges. That statement also reflected a payment in the amount of $3,554.00. This payment was made by a check from Nationwide Appraisal Services Corporation and was the result of a debt consolidation loan which Miller and his wife had obtained and which was secured by a second mortgage on their home. The March 24 statement showed a balance of $656.49. About this time, Miller became separated from his wife and moved into a hotel.

Meanwhile, although the bankruptcy petition was not filed until June 15, Miller consulted a bankruptcy attorney on March 17, 1998, at which time he paid his bankruptcy counsel $500.00 plus the bankruptcy filing fee.

Miller continued to use his Universal card to make purchases and take cash advances after the day he paid his bankruptcy attorney. In fact, his use of the card dramatically increased at that time, partly due to his separation from his wife. The account statements showed that after March 17, Miller made purchases in the amount of $1,867.71; took cash advances in the amount of $705.50; and made a single payment in the amount of $100.00. The majority of the purchases were for hotels and restaurants.

Universal asserts that the debt to it should be declared nondischargeable under § 523(a)(2). That section provides, in pertinent part:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(i) that is materially false;

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; or

(C) for purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $1,000 for "luxury goods or services" incurred by an individual debtor on or within 60 days before the order for relief under this title, or cash advances aggregating more than $1,000 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 60 days before the order for relief under this title, are presumed to be nondischargeable; "luxury goods or services" do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor . . . .

11 U.S.C. § 523(a)(2). Subsection (C) does not apply because the cash advances taken within 60 days prior to the order for relief (June 15) aggregated less than $1,000 and although the total amount charged to the Universal card within 60 days prior to June 15 aggregated more than $1,000, Universal did not prove they were for "luxury goods or services."

In addition, although Universal pled this action under both subsection (A) and (B) of § 523(a)(2), it offered no evidence to support an allegation that Miller provided it with a false financial statement. Therefore, the only applicable provision is subsection (A).

■ In order to prevail under § 523(a)(2)(A), the creditor must prove, by a preponderance of the evidence:

(1) that the debtor made representations;

(2) that at the time he knew they were false;

(3) that he made them with the intention and purpose of deceiving the creditor;

(4) that the creditor justifiably relied on the representations; and

(5) that the creditor sustained a loss as the proximate result of the representations having been made.

*In re Ophaug,* 827 F.2d 340, 342 n. 1 (8th Cir.1987); *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995); *Green Tree Fin. Corp. v. Beasley (In re Beasley),* 202 B.R. 979, 983 (Bankr.W.D.Mo. 1996). The evidence presented on-exceptions to discharge are to be narrowly construed against the objecting creditor and liberally viewed in favor of the debtor. *In re Beasley,* 202 B.R. at 983 (*citing In re Wheatley,* 158 B.R. 140, 143 (Bankr.W.D.Mo.1993)).

■ This Court maintains, despite disagreement by some other courts, that by using a credit card, a debtor makes the representation that he has both the intent and the ability (at least in the relatively foreseeable future) to repay the debt. At the very least, he represents that he will honor the credit card agreement by making the minimum monthly payments. *Accord AT&T Universal Card Servs. Corp. v. Reynolds (In re Reynolds),* 221 B.R. 828, 839–40 (Bankr. N.D.Ala.1998) (by using a credit card, the debtor represents that he has at least the ability to make the minimum monthly payment); *AT&T Universal Card Servs. Corp. v. Reach (In re Reach),* 225 B.R. 236 (Bankr. N.D.Ala.1997) (although the use of a credit card does not imply an ability to repay the debt, by using a credit card, the debtor represents that he intends to abide by the cardholder agreement and to pay at least the minimum specified installment over time with interest). Thus, each time Miller used his credit card, whether to obtain a cash advance or make a purchase, he represented to Universal that he had both the intent to repay the charges and the ability to make at least the minimum monthly payments under the credit card agreement.

■ With these principles in mind, the facts of this case necessitate that the debt to Universal be separated into two categories: those charges made prior to Miller's consultation with his bankruptcy attorney and those made after the consultation. As to the former, the Court finds that Universal failed to prove, by a preponderance of the evidence, that Miller lacked the intent or ability (at that time) to repay it. Although Miller's financial situation was starting to deteriorate by early 1998, he was attempting, by paying off higher-interest credit with a lower-interest credit card and through a debt consolidation loan, to manage his debt. He and his wife also discussed selling the house to pay debts, but for whatever reason, that failed to come to fruition. Furthermore, the majority of the balance owed on the card did not occur until after March 17, when Miller started charging significant amounts to hotels and restaurants. By the Court's calculation from the statements, as of March 16, the debtor actually had a credit balance on the Universal account of approximately $495.45 as a result of the payment made from the debt consolidation proceeds. The March 24 statement showed an ending balance of only $656.49. The Court finds, therefore, that Universal failed to prove that Miller lacked the intent or ability to repay the debt as to the charges made prior to March 17.

■ In contrast, as to the charges incurred after March 17, the Court believes

that Miller patently lacked the intent to repay the charges he incurred after he consulted and paid his bankruptcy attorney on March 17. Thus, his representations to Universal that he intended to repay those charges and cash advances were false.

Miller's counsel asserted at trial that Miller's history with the account did not support a finding that Miller did not intend to repay the debt. Although counsel conceded that Miller's seeing a bankruptcy attorney in March and then continuing to use the credit card thereafter could be indicative of fraudulent intent, counsel suggested that not everyone who visits an attorney actually files bankruptcy and that Miller's decision to ultimately file bankruptcy was not made until June. While the Court may agree that in some cases a debtor who consults a bankruptcy attorney may ultimately find another alternative and decide not to file the petition, the Court believes this is the rarer of the two possible outcomes. Consequently, using a credit card after consulting a bankruptcy attorney is, in most cases, going to be fatal to the debtor's assertion that he intended to repay the debts he incurred after that point, particularly if he pays the attorney the filing fee for the bankruptcy and the entire attorney fee for the bankruptcy.

Furthermore, the Court believes the facts in this case belie the assertion that Miller intended to repay the debts he incurred after March 17. Most significantly, although the statements and schedules were not dated until June 12, 1998, the Statement of Financial Affairs and the Statement Pursuant to Rule 2016(B) reveal that Miller actually paid his entire attorney's fee of $500.00, as well as the $175.00 bankruptcy filing fee, on March 17, 1998, and there was no balance owing to Miller's attorney after that date.

The Court is unsure why Miller waited three months to file the petition, but the evidence suggests that in March, he certainly planned to file. As far as the Court can tell, there was nothing left for Miller to do but to sign the schedules and file the petition. Thus, Miller continued to use his credit card, at a dramatically increased pace, while anticipating the debt would be discharged in his forthcoming bankruptcy. Thus, the Court finds Miller's representations that he intended to repay the charges incurred after March 17 were false.

In addition, Miller made the false representations with the intention and purpose of deceiving Universal and Universal certainly suffered a loss due to Miller's false representation. Thus, the only remaining issue is whether Universal justifiably relied on Miller's false representations.

Universal's witness at trial testified as to the process it employs in soliciting customers such as Miller. It receives a list from a credit bureau and uses a FICO score to determine creditworthiness, taking into consideration the number of credit cards the debtor has, the total amount of debt, and so forth. After internal screening is done by Universal, it sends the solicitation to those persons who qualify for pre-approved credit. Once a person is given a credit card, Universal orders credit bureau reports on a monthly or bi-monthly basis. If the score drops below 680, Universal usually takes some action on the account, varying from lowering the credit limit to cancellation of the card.

Universal presented evidence that from June 1, 1997, through April 15, 1998, it ran six credit checks on Miller (one every two months). Miller's scores varied from 688 to 717 and never dipped below 680. Miller's record revealed no red flags and Universal was not advised that Miller was considering filing bankruptcy until June 16. Miller made a sizeable payment ($3,554.00) on March 5, which was reflected on the March 24 statement. The March 24 statement shows a minimum payment due in the amount of only $14.00. Although the April 24 statement reflects that Miller had failed to make a payment within that billing cycle and so the April 24 statement shows a past due amount of $14.00 and a minimum amount due in the amount of $44.00, Miller made a $100.00 payment on May 14, bringing the account current. Then, before Universal sent out its next statement, Universal was informed that Miller had filed bankruptcy.

Thus, because Universal took reasonable steps to monitor Miller's creditworthiness and those efforts revealed no red flags which

would have alerted Universal to Miller's deteriorating financial condition, Universal justifiably relied on Miller's statements that he intended to repay the debt.

As a result, the Court finds that the portion of the debt to Universal which was incurred after March 17, 1998, or $2,573.21, is nondischargeable under § 523(a)(2)(A). Any requests for attorneys' fees are denied.