In re William R. **PICKETT**, Debtor.

**Universal Card Services f/k/a AT & T Universal Card Services,**
Plaintiff,

v.

**William R. Pickett, Defendant.**

**Nationsbank of Delaware, N.A., Plaintiff,**

v.

**William R. Pickett, Defendant.**

Bankruptcy No. 98–44602–1.
Adversary Nos. 99–4015–1, 99–4016–1.

United States Bankruptcy Court,
W.D. Missouri,
Western Division.

June 15, 1999.

Daniel S. Rabin, Overland Park, KS, Neil S. Sader, Kansas City, MO, for plaintiff.

Jonathan A. Margolies, Kansas City, MO, for defendant.

### MEMORANDUM OPINION AND ORDER

JERRY W. VENTERS, Bankruptcy Judge.

On January 21, 1999, Universal Card Services ("Universal") and NationsBank of Delaware, N.A. ("NationsBank") filed adversary complaints against the Debtor, William R. Pickett, seeking to avoid the discharge of certain credit card debts incurred by the Debtor prior to the filing of his Chapter 7 bankruptcy on October 26, 1998. Both creditors seek determinations of nondischargeability pursuant to 11 U.S.C. §§ 523(a)(2)(A) and (a)(2)(C). With the agreement of the parties, the Court held a consolidated hearing on the Adversary Proceedings on May 19, 1999. Because of the similar and overlapping nature of these claims and the Debtor's defenses, the Court will issue this combined Memorandum Opinion and Order disposing of all issues in both proceedings. Separate judgments will be entered in the Adversary Proceedings. This Court has jurisdiction over these matters pursuant to 28 U.S.C. § 1334 and both proceedings are core proceedings pursuant to 28 U.S.C. § 157(b)(2)(I).

For the reasons set out below, the Court finds that the Debtor is not entitled to discharge of the debts owed Universal and NationsBank by virtue of the provisions of § 523(a)(2)(A) and will therefore deny the discharge of those debts.

The following constitutes Findings of Fact and Conclusions of Law in accordance with Rule 52 of the Federal Rules of Civil Procedure as made applicable to this proceeding by Rule 7052 of the Federal Rules of Bankruptcy Procedure.

### FACTUAL BACKGROUND

#### 1. The Universal Complaint

Universal's Complaint requests a denial of discharge for $6,688.20 for two cash advances which were obtained by the Debtor against his Universal credit card account within 60 days of the filing of the Debtor's bankruptcy. The parties stipulated that the Debtor obtained a cash advance of $1,800.00 on his credit card account with Universal on August 31, 1998, and a second cash advance of $5,000.00 on September 9, 1998. It was also stipulated that the Debtor made payments on the account of $138.00 on October 6, 1998, and $183.00 on October 16, 1998, less than 30 days prior to the bankruptcy filing.

Susan Bender, a bankruptcy specialist for Universal, testified that Pickett's Universal account was opened in August 1998, less than 90 days before the bankruptcy filing, as the result of a telephone application by Pickett. The screening process used by Universal disclosed that Pickett was a good credit risk based on the representations made by Pickett and his financial history as obtained by Universal. In making the telephone application, Pickett represented that he had an annual gross income of $210,000.00. Universal's review showed that the Debtor was using only 22% of the credit that he had available to him, and that he had a satisfactory trade history with respect to 23 different bank revolving charge accounts and other credit accounts. Pickett also had a "good score" of 741 on the basis of the FICO screening employed by Universal (with 900 being the highest score possible and 680 being the lowest score at which a card would be offered to an applicant).[1] When this favor-

---

1. The FICO score is a standardized rating of a person's "creditworthiness" developed by the

able credit history was combined with the very substantial annual income reported by Pickett, Universal decided that a credit card could be issued to Pickett.

However, Bender testified that Universal would never have opened the account for Pickett if it had had the information which was subsequently disclosed in Pickett's bankruptcy schedules. For example, Schedule I showed that Pickett had a monthly net take-home pay of only $1,694.00 ($20,328.00 annually), whereas on his credit card application he represented that he had an annual income of $210,000.00, close to ten times his actual income, and Schedule J showed that Pickett had monthly living expenses of $5,185.00, resulting in a monthly shortfall of $3,491.00. Additionally, Schedule F reflected more than $389,000.00 in unsecured debt, and the statement of financial affairs reflected gambling losses of $100,000.00 in the preceding 12 months and either very small profits or losses in the Debtor's business operation in the preceding two years.

Typically, Universal conducts a bi-monthly computer review of credit bureau reports on a cardholder. These bi-monthly reviews enable Universal to determine if payments are being made late, if a bankruptcy has been filed, or if there are matters that indicate potentially fraudulent activity. In the Debtor's case, Universal had not conducted any reviews before the Debtor filed his Chapter 7 bankruptcy, which was less than three months after opening his account.

Universal called as a witness a financial analyst from a Kansas City area gambling casino, the Flamingo,[2] who produced records indicating that Pickett lost $70,313.00 at the gambling tables in the last six months of 1998, including losses of $18,106.00 in August and $11,850.00 in September. Universal also offered in evidence the first two pages of Pickett's 1998 federal income tax return, which showed wage income of $56,937.43 and business losses of $471,000.00. Pickett's total income for 1998 was a negative $412,979.95.

## 2. The NationsBank Complaint

NationsBank seeks a determination of nondischargeability with respect to $16,271.92 in cash advances which the Debtor obtained on two separate NationsBank accounts between August 17 and September 13, 1998.

Pickett was originally invited to apply for a Visa credit card account with NationsBank because Pickett was a frequent U.S. Air customer. His original credit application, dated in May 1990, showed a gross monthly salary of $40,000.00. According to the Bank's witness, the Bank verified the income information provided by the Debtor and, after obtaining his FICO scores, supplied him a credit card with an initial credit limit of $5,000.00. At various times between 1990 and 1994, Pickett wrote letters to NationsBank requesting an increase in the credit limit. On several occasions, he provided NationsBank with additional financial information showing that he had a gross monthly salary ranging between $8,333.33 and $10,000.00. As a result of these various requests, Pickett's credit limit on the Visa account was eventually increased to $12,000.00.

Fair, Isaac and Co. It is the product of a computer modeling based on all of the information contained in credit bureau reports. Although the exact factors considered and their relative weight are not disclosed, they supposedly include: payment history, public records and collection items, delinquencies, outstanding debts, number of balances, average balances across all trade lines, relationship between total balances and total credit limits on revolving trade lines, credit history, age of oldest trade line, and several other factors. Judge Arthur B. Federman of this Court provides a thorough discussion of the credit granting process and the use of FICO scores in *In re Ellingsworth*, 212 B.R. at 330–332. *See also,* Bob Kerlin, *Knowing the score on credit*, THE WASHINGTON TIMES, March 21, 1997, at F.

2. The Flamingo Casino is a state-licensed gambling casino on the Missouri River.

The Debtor also had a Mastercard account with NationsBank, although the testimony was not clear as to how the Debtor opened that account. In any case, the Mastercard account was opened on November 2, 1989. At the time of the bankruptcy filing, the credit limit on the Mastercard account was $6,200.00.

Prior to mid–1998, the Debtor had never taken any cash advances on either of the NationsBank credit card accounts. However, in August and September 1998, Pickett obtained $16,271.92 in cash advances on the two accounts. Three of the cash advances were in the sum of $4,000.00 each and were obtained at a local bank. On eight separate occasions in August and September 1998, Pickett obtained cash advances of $533.99 each at the Flamingo Casino in Kansas City, totaling $4,271.92.

The Debtor made payments on the Visa account of $4,731.80 on August 1, $72.09 on August 6, and $336.30 on October 13. He made a payment of $155.00 on the Mastercard account on October 3, 1998.

### 3. The Debtor's Defenses

For the 12 years prior to filing bankruptcy in October 1998, the Debtor was engaged in the operation of various weight loss clinics. Until 1996, the weight loss clinics were operated by corporate entities owned by Pickett, but in that year he changed to a sole proprietorship for most of his operations. Immediately prior to the bankruptcy filing, Pickett was operating six weight loss centers known as Slimmer Image Weight Loss Clinics. Up until 1998, the weight loss clinics had been very profitable, but in 1998 a serious downturn occurred. This downturn was brought about by a number of factors, according to Pickett, including a public disenchantment with weight loss clinics, the entry of a strong competitor in the local market, and

the negative publicity that followed the Food and Drug Administration's withdrawal of its approval for a popular weight loss prescription drug know as Phen–Fen. Pickett testified that his businesses were not generating enough income to pay operating expenses, so he obtained cash advances against his personal credit card accounts and used those cash advances to pay the business operating expenses. However, Pickett could not recall if he used the money obtained at the casino for business operations, and he was also unable to produce documents showing where any of the money obtained by the cash advances went or where the money was deposited.

With respect to the gambling losses and the cash advances obtained at the gambling casino, Pickett disputed the losses shown by the records produced by the financial analyst from the Flamingo Casino, stating that he "never had that much money."

Pickett testified that he had every intention of repaying the credit card accounts and was hopeful of surviving his business financial difficulties, but on October 8, 1998, the Bank of Jacomo seized $52,-176.83 from his account and applied that money to a past-due note held by the bank. Pickett testified that he had had financial problems before and had come out of them successfully, and that although "the business world is uncertain," he hoped to successfully come out of his financial difficulties in 1998. He "obviously hoped business would improve."

### DISCUSSION

Both Universal and NationsBank contend that the debts owed to them should be declared nondischargeable pursuant to §§ 523(a)(2)(A) and (a)(2)(C).[3]

\* \* \*

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

\* \* \*

---

**3.** Sections 523(a)(2)(A) and (a)(2)(C) provide:
  (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

■ In order to prevail under § 523(a)(2)(A), the creditor must prove, by a preponderance of the evidence:

(1) That the debtor made representations;

(2) That at the time he knew the representations were false;

(3) That he made the representations with the intention and purpose of deceiving the creditor;

(4) That the creditor justifiably relied on the representations; and

(5) That the creditor sustained a loss as the proximate result of the representations having been made.

*In re Miller,* 228 B.R. 237, 240 (Bankr. W.D.Mo.1998); *Thul v. Ophaug (In re Ophaug),* 827 F.2d 340, 342 (8th Cir.1987); *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 446, 133 L.Ed.2d 351 (1995); *Green Tree Fin. Corp. v. Beasley (In re Beasley),* 202 B.R. 979, 983 (Bankr.W.D.Mo.1996). Exceptions to discharge are to be narrowly construed against the objecting creditor and liberally construed in favor of the debtor. *In re Beasley,* 202 B.R. at 983 (citing *In re Wheatley,* 158 B.R. 140, 143 (Bankr.W.D.Mo.1993)).

■ In most cases involving dischargeability of credit card debts, the key issues are whether the debtor has made a representation that he or she intends to repay the money borrowed, *AT&T Universal Card Services Corp. v. Feld (In re Feld),* 203 B.R. 360, 366 (Bankr.E.D.Pa.1996); *Chevy Chase Bank v. Briese (In re Briese),* 196 B.R. 440, 449 (Bankr. W.D.Wis.1996), and whether the creditor justifiably relied on the debtor's representation that he or she intended to repay, *Field v. Mans,* 516 U.S. 59, 73–75, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995). Such is the case here. The other issues common to these cases are not in dispute: Pickett used his credit cards to obtain the cash advances and the plaintiffs were harmed by such use.

### 1. The Debtor's Intent and Ability to Repay

In recent years, bankruptcy courts have wrestled at some considerable length with the question of whether a debtor's use of a credit card to obtain goods or money is an implied or express representation that the debtor has both the ability and intent to repay the debt. In the earlier cases, some courts held that a debtor makes an implied representation with each use of a credit card that he or she has both the ability and intent to repay the debt. *Advanta National Bank v. Kurtz (In re Kurtz),* 213 B.R. 253, 259 (Bankr.N.D.N.Y.1997); *Household Card Services/Visa v. Vermillion (In re Vermillion),* 136 B.R. 225, 227 (Bankr.W.D.Mo.1992); *FCC Nat'l Bank v. Bartlett (In re Bartlett),* 128 B.R. 775, 779–80 (Bankr.W.D.Mo.1991); *First Deposit Credit Services Corporation v. Preece (In re Preece),* 125 B.R. 474, 477 (Bankr. W.D.Tex.1991). Other courts have held that the credit card company assumes the risk of nonpayment with the use of the card, unless the issuer has instructed the debtor to stop using its card. *First Nat'l Bank of Mobile v. Roddenberry (In re Roddenberry),* 701 F.2d 927, 932–33 (11th Cir.1983).

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

\* \* \*

(C) for purposes of subparagraph (A) of this paragraph, consumer debts owed to a single creditor and aggregating more than $1,075 for "luxury goods or services" incurred by an individual debtor on or within 60 days before the order for relief under this title, or cash advances aggregating more than $1,075 that are extensions of consumer credit under an open end credit plan obtained by an individual debtor on or within 60 days before the order for relief under this title, are presumed to be nondischargeable; "luxury goods or services" do not include goods or services reasonably acquired for the support or maintenance of the debtor or a dependent of the debtor; an extension of consumer credit under an open end credit plan is to be defined for purposes of this subparagraph as it is defined in the Consumer Protection Act;

The bankruptcy courts in this District have, more recently, held that, by using a credit card, a debtor makes the express representation that he or she has both the intent and the ability to repay. *See Universal Card Services v. Miller (In re Miller)*, 228 B.R. 237, 240 (Bankr. W.D.Mo.1998), *AT&T Universal Card Services v. Ellingsworth (In re Ellingsworth)*, 212 B.R. 326, 334 (Bankr.W.D.Mo.1997). Likewise, it is this Court's belief that, by using a credit card, the debtor is making a representation to the credit card issuer that he or she has both the intent and the ability to repay the debt in accordance with the requirements of the credit card agreement. At the very least, the debtor, by using his credit card to obtain a cash advance or make a purchase, is expressly telling the credit card issuer that he or she intends to repay the amount borrowed and has the ability to repay the amounts on the terms required by the issuer, whether that repayment is in the form of minimum monthly payments required by the credit card agreement or in some different or larger amounts.

Furthermore, it is this Court's view that the debtor's reckless disregard for the truth as to whether he or she has the intent to repay a credit card debt satisfies the element of misrepresentation that the debtor has made an intentionally false representation in obtaining the credit or, in this case, the cash advance. See *Anastas v. American Savings Bank (In re Anastas)*, 94 F.3d 1280, 1286 (9th Cir.1996). If the court finds that a debtor knew he was unable to repay or incurred the debt with reckless disregard as to a reasonable belief that he could repay, then fraud is proven. *Vermillion*, 136 B.R. at 227.

Because direct proof of a debtor's actual intentions is nearly impossible to obtain, the courts have developed numerous circumstantial factors which, like the "badges of fraud" familiar to most courts and attorneys, may be relied upon to infer the debtor's true intent. Some of these circumstantial factors are:

1. The length of time between the charges made and the filing of bankruptcy;
2. Whether or not an attorney has been consulted concerning the filing of bankruptcy before the charges were made;
3. The number of charges made;
4. The amount of the charges;
5. The financial condition of the debtor at the time the charges are made;
6. Whether the charges were above the credit limit of the account;
7. Whether the debtor made multiple charges on the same day;
8. Whether or not the debtor was employed;
9. The debtor's prospects for employment;
10. The debtor's financial sophistication;
11. Whether there was a sudden change in the debtor's buying habits; and
12. Whether the purchases were made for luxuries or necessities.

*Ellingsworth*, 212 B.R. at 334–35; *Citibank South Dakota N.A. v. Dougherty (In re Dougherty)*, 84 B.R. 653, 657 (9th Cir. BAP 1988); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir. 1987); *Sears, Roebuck and Co. v. Faulk (In re Faulk)*, 69 B.R. 743, 757 (Bankr. N.D.Ind.1986); *Chase Manhattan Bank v. Carpenter (In re Carpenter)*, 53 B.R. 724, 730 (Bankr.N.D.Ga.1985).

A number of these factors are present in this case and convince the Court that the Debtor here did not have the intent or ability to repay the cash advances which he obtained from Universal and NationsBank.

First, the Debtor obtained cash advances exceeding $22,000.00 less than 90 days preceding his bankruptcy filing on October 26, 1998, on three different accounts from which cash advances had not

been obtained previously. The cash advances were in significant amounts, ranging from $533.99 to $4,000.00. Second, the cash advances were obtained at a time when the Debtor's weight loss clinics were losing money and were unable to pay their operating expenses on a current basis. Although the Debtor testified that the cash advances were used to pay the operating expenses of his business, the Debtor was unable to produce, or at least did not produce though requested, documentary evidence to establish that the funds were, in fact, used in the operation of his business.[4] Third, on eight separate occasions in the two months preceding the bankruptcy filing, Pickett obtained more than $4,200.00 in cash advances at a local gambling casino, and it is highly unlikely that those funds were used to pay the operating expenses of the Debtor's business. Much more likely, those funds were lost at the gambling tables at the casino, particularly in view of the fact that the casino's records showed that the Debtor had gambling losses of $18,106.00 in August and $11,850.00 in September. Several of the cash advances were obtained on dates that the Flamingo Casino's records showed that Pickett suffered gambling losses. For instance, on September 12, 1998, Pickett made three $500.00 cash advance withdrawals at the casino on the NationsBank account, and on that same date, the casino's records indicated that Pickett suffered gambling losses of $2,700.00. On September 13, an additional cash advance of $500.00 was taken and on that same date Pickett lost $1,100.00 at the casino. This evidence corroborates the Court's conclusion that many of the cash advances obtained by the Debtor in the month or two before the bankruptcy filing were used to support Pickett's gambling habits, not his business.

Fourth, the Debtor admitted, and his bankruptcy schedules showed, that the Debtor's personal living expenses in the months preceding the bankruptcy filing were more than $3,000.00 in excess of his monthly income, which would raise very serious questions in anyone's mind as to the Debtor's ability to repay the borrowings. Fifth, as shown by the Debtor's bankruptcy schedules, the Debtor had some $389,000.00 in unsecured debt alone at the time he was obtaining the cash advances from Universal and NationsBank. He also listed $42,000.00 in past-due alimony payments as a priority debt and $132,000.00 in secured debts. Given that amount of debt, the Debtor had to know, if he were being realistic, that he would not be able to repay the debts he was incurring. In short, he was hopelessly insolvent. Sixth, there are the losses that were being sustained by the Debtor in connection with his business. As just noted, the bankruptcy schedules showed that the Debtor had unsecured debts of $389,000.00. The Debtor's 1998 tax return indicated that the Debtor, a cash basis taxpayer, also lost $471,000.00 in his business operations. When these operating losses and nonpayment of supplier debts are combined, it appears the Debtor was accumulating losses of nearly $1 million in 1998. Granted, all of these losses most likely did not occur in 1998 alone but probably were the culmination of losses suffered over a longer period of time. Just the same, the Debtor had to be aware of

---

**4.** In the Universal case, there were substantial and continuing disputes between the attorneys over the Debtor's failure to produce numerous records requested by the Plaintiff. The Court's intervention was required to resolve those disputes. A week before the hearing, the Court denied Universal's request for a continuance because of the Debtor's failure to produce requested documents showing in detail how the cash advances were used by the Debtor. (The Debtor, in answers to interrogatories, had said simply that the money was used for "working capital.") The Court stated at that time that the Debtor's specific *use* of the funds obtained was not a material issue in the case, and that is still true. However, it seems to the Court that it was incumbent on the Debtor to prove, by other than his oral testimony that the funds at least were deposited in the business bank account. This he did not do.

them. Seventh, the Debtor acknowledged that, many years ago, he studied accounting in college. With that background and his extensive background in business, the Debtor should have been aware that he would not be able to repay the debts he was incurring when he took the cash advances on his credit cards. Finally, the Debtor's assertions that he intended to repay these debts lose their force when the Debtor, by his own admissions, was in the process of gambling away $100,000.00 in the space of a single year.

The Debtor insisted that it was his intent to repay the cash advances obtained from Universal and NationsBank, and insisted that he would have been able to do so until Bank of Jacomo "grabbed my money," referring to the Bank of Jacomo's seizure of $52,176.83 in the Debtor's bank account on October 8, 1998. He points to the few small payments he made in October as proof of his intent to repay the debts. The Debtor said that he had had financial problems before and had managed to work his way out of them, and he was hopeful that he would come out of this difficult period in his business.

■ The Debtor's protestations are not credible in light of the very substantial evidence that the Debtor's business was losing substantial amounts of money in the period immediately preceding the bankruptcy filing on October 26, 1998, and in the face of evidence that the Debtor was losing substantial sums at the gambling tables during the same period of time. A mere profession of intent to repay is not sufficient if the Debtor is not credible as to his intent. *Ellingsworth,* 212 B.R. at 341; *see also, La Capitol Federal Credit Union v. Melancon (In re Melancon),* 223 B.R. 300, 335 (Bankr.M.D.La.1998) ("[A] statement of intent (I will repay) is distinguishable from a hope or a desire to repay. An intent to repay suggests a plan to repay."); *Comerica Bank–Detroit v. Nahas (In re Nahas),* 92 B.R. 726, 730 (Bankr.E.D.Mich. 1988) ("[A] mere hope to repay, without any basis in reality, is insufficient."). The

Court regards the Debtor's minimal payments in October as nothing more than an attempt to further deceive the creditors as to his true inability to repay. Finally, the $52,000.00 seized by the Bank of Jacomo would have paid only a small fraction of Pickett's very substantial debts. The seizure of his bank account by the bank was not the cause of Pickett's business failure and his nonpayment of debts, although it may have been the final straw that broke the proverbial camel's back.

The Court believes that the cash advances being taken by the Debtor from the Universal and NationsBank accounts were acts of desperation in an attempt to save the Debtor's weight loss clinic business and to support his gambling habits. These borrowings occurred in the face of overwhelming evidence that should have made it obvious to Pickett that he would be unable to repay them. In obtaining these particular cash advances, Pickett recklessly disregarded the reasonableness of his intent to repay and therefore deceived and defrauded both Universal and Nations-Bank.

When all of these factors are taken into account, the Court is convinced beyond any doubt that the Debtor did not have the intent or ability to repay the debts he was incurring with Universal and NationsBank, and therefore the Debtor should be denied discharge of those debts pursuant to § 523(a)(2)(A).

In view of this holding, the Court need not reach the question of whether a portion of the debts is nondischargeable pursuant to § 523(a)(2)(C). However, the Court would observe that the creditors failed to meet their burden under that subsection, in that they failed to show that the debts were consumer debts or that they were obtained for the purchase of "luxury goods or services." 11 U.S.C. § 523(a)(2)(C).

**2. The Creditors' Reliance**

Next, the Court turns to a consideration of whether the creditors, Universal and

NationsBank, justifiably relied on the Debtor's representations of his intent to repay when he obtained the cash advances. In *Field v. Mans,* 516 U.S. 59, 73–75, 116 S.Ct. 437, 444, 133 L.Ed.2d 351 (1995), the Supreme Court held that § 523(a)(2)(A) requires justifiable, but not reasonable, reliance on the part of the creditor in extending credit to a debtor. The Court explained the difference between justifiable and reasonable reliance by quoting the following from the Restatement (Second) of Torts (1976):

"Although the plaintiff's reliance on the misrepresentation must be justifiable ... this does not mean that his conduct must conform to the standard of the reasonable man. Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than of the application of a community standard of conduct to all cases."

*Field v. Mans,* 516 U.S. at 70–71, 116 S.Ct. 437 (quoting Restatement (Second) of Torts, § 545A, comment b.).

The Court went on to explain that justifiable reliance requires the alleged victim of a misrepresentation to use his senses, and that he "cannot recover if he blindly relies upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation." *Field v. Mans,* 516 U.S. at 71, 116 S.Ct. 437 (quoting Restatement (Second) of Torts, § 541, comment a.). *See also, Wayne Lumber Co. v. Peternel (In re Peternel),* 220 B.R. 923, 929 (Bankr.N.D.Ohio 1998) ("Justifiable reliance is a subjective standard that takes into account the qualities and characteristics of the particular creditor and the circumstances of the particular case."); *First Deposit National Bank v. Mack (In re Mack),* 216 B.R. 981, 985 (Bankr. N.D.Fla.1997) (justifiable reliance requires the creditor to exercise "at least some degree of diligence in determining the credit worthiness of the recipient.").

■ In the instant case, the Court believes that the creditors justifiably relied on Pickett's representations when they extended the credit at issue to him. Both creditors employed appropriate screening processes and neither creditor received any warning of fraud or other irregularities in time to take action to prevent the Debtor's fraud.

As to Universal, the screening process employed by Universal in the months just prior to the bankruptcy filing indicated that Pickett was a good credit risk in that his FICO score was 741. Universal's witness testified that Universal will not establish a new credit account for a debtor with a score of less than 680. Universal's investigation also indicated that the Debtor had a satisfactory credit history with other revolving charges and bank debt, and that he was using only 22% of the credit available to him at the time of the screening and application process. Furthermore, the Debtor himself had represented his annual income as $210,000.00, although, as things developed, this representation was patently false. The only red flag that came up during the application process in opening the Universal account was a discrepancy in the addresses used by Pickett in applying for the account, and this difference in home and business addresses was resolved to Universal's satisfaction.

According to Universal's witness, Universal typically checks or reviews a borrower's credit bureau scores every other month while the credit is open. In this instance, the Debtor's credit account was opened in August, he immediately obtained the cash advances, and then he filed bankruptcy before any bi-monthly review could be made. Under these circumstances, the creditor had no indication that the representations made by Pickett were in any way false or misleading and the creditor had no warning that it had been deceived so that it could have made an investigation to determine the true facts.

As for NationsBank, the evidence indicated that NationsBank follows procedures

much like those of Universal. The Bank's witness testified that, when the Debtor's accounts were established in 1989 and 1990, his financial information was verified and a FICO score was obtained. The witness indicated that NationsBank reviews its credit accounts every four to six months for any problems. There apparently were no indications of problems with the Debtor's account.

██ -Pickett had not obtained cash advances on either of the NationsBank accounts prior to the cash advances which he obtained in August and September 1998. Even assuming that these cash advances were somehow abnormal or suspicious, NationsBank would not have had sufficient time prior to the bankruptcy filing in which to have reviewed the account and prevented the Debtor from obtaining further cash advances. The obtaining of cash advances in and of themselves would certainly not be suspicious or particularly unusual, inasmuch as the credit accounts are designed to allow for cash advances in the normal course of events. In short, the Debtor's obtaining of cash advances, particularly when the credit limit was not being exceeded, would not serve as any kind of warning that NationsBank was being deceived and that it should commence an investigation on its own.

### 3. Attorneys' Fees

██ Both Universal and NationsBank sought recovery of their attorneys' fees and expenses in their respective Adversary Proceedings.

Universal's credit card agreement provided:

> [I]f we refer this claim to an attorney for collection, you will be liable for any reasonable attorney's fees we incur, plus the costs and expenses of any legal action.

Counsel for Universal did not adduce any evidence of the amount of his fees or expenses incurred in this case. The Court is aware that counsel for both parties conducted more than the usual amount of discovery in this case, and more than the usual number of discovery disputes arose (see footnote 4, *supra* ). Plaintiff's counsel took the Debtor's Rule 2004 examination, as well, and was required to bring in a witness from the State of Florida.

The Court is considered an expert on attorneys' fees. *First Deposit National Bank v. Cameron (In re Cameron),* 219 B.R. 531, 542 (Bankr.W.D.Mo.1998). Upon consideration of the entire file, the Court finds that Universal should be awarded the sum of $2,500.00 in attorneys' fees, plus the cost of the Debtor's Rule 2004 examination and $150.00 for the filing fee paid herein.

██ NationsBank's credit card agreement contained a slightly different provision for the recovery of attorneys' fees and expenses. It stated:

> If we referred collection of the Account to a lawyer or have to determine the non-dischargeability of the Account debt in a bankruptcy court, you will pay our reasonable attorney fees plus court costs and all other fees allowed by law.

NationsBank's witness testified that NationsBank had incurred $1,950.00 in attorneys' fees and travel expenses of $1,087.00 for its out-of-state witness. The Court will award NationsBank its attorneys' fees of $1,950.00, but the cardholder agreement does not authorize recovery of the witness's travel costs. The agreement allows only for recovery of "all other *fees* allowed by law." (emphasis added) Travel expenses are not fees. Had NationsBank's agreement provided for recovery of the *costs and expenses* of any legal action, as Universal's agreement did, the Court would not hesitate to award NationsBank the $1,087.00 in travel costs incurred by the witness. However, such is not the case.

### 4. `The Debtor's "Claims"

In the Universal case, the Debtor filed a *pro se* responsive pleading in which he asserted that Universal's Complaint was

not timely filed. That claim is without merit. The deadline for filing dischargeability complaints was January 22, 1999, 60 days after the scheduled meeting of creditors (F.R.Bankr.P.4004(a)), and Universal's Compliant was filed on January 21, 1999.

In the NationsBank case, the Debtor, again responding *pro se*, made several assertions under the caption "Defendant's Claims." These so-called claims were, at best, affirmative defenses, and were not counterclaims on which any affirmative relief against NationsBank was sought. The Court has considered these "claims" and the evidence (if any) offered in support of them, and finds that they are without merit.

## CONCLUSION

For the reasons set out above, it is

**ORDERED** that the debt of $6,688.20 owed to Plaintiff Universal Card Services by the Debtor, William R. Pickett, be and is hereby determined to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and the Debtor is denied discharge as to said indebtedness. Plaintiff Universal Card Services is denied the relief requested under 11 U.S.C. § 523(a)(2)(C). It is **FURTHER ORDERED** that Plaintiff Universal Card Services be and is hereby awarded $2,500.00 in attorneys' fees, plus the costs of the Debtor's Rule 2004 examination and the $150.00 filing fee incurred herein. It is

**FURTHER ORDERED** that the debt of $16,271.92 owed to Plaintiff Nations-Bank of Delaware by the Debtor, William R. Pickett, be and is hereby determined to be nondischargeable pursuant to 11 U.S.C. § 523(a)(2)(A) and the Debtor is denied discharge as to said indebtedness. Plaintiff NationsBank of Delaware is denied the relief requested under 11 U.S.C. § 523(a)(2)(C). It is

**FURTHER ORDERED** that Plaintiff NationsBank of Delaware be and is hereby awarded $1,950.00 in attorneys' fees, plus the $150.00 filing fee incurred herein. It is

**FURTHER ORDERED** that Debtor/Defendant William R. Pickett is denied any and all affirmative relief sought in his responsive pleadings.

The Clerk shall enter separate Judgments in Adv. Nos. 99–4015 and 99–4016 in accordance herewith.