**In the Matter of Irene K. FRONNING, Debtor.**

**AT&T UNIVERSAL CARD SERVICES, Plaintiff,**

**v.**

**Irene K. FRONNING, Defendant.**

**Bankruptcy No. BK96–41867.
Adversary No. A97–4017.**

United States Bankruptcy Court.
D. Nebraska.

May 28, 1998.

Jennifer Amen, Omaha, NE, for Plaintiff.

Gene C. Foote, II, Hastings, NE, for Defendant.

### *MEMORANDUM*

JOHN C. MINAHAN, Jr., Bankruptcy Judge.

The plaintiff, AT & T Universal Card Services ("AT & T"), brought this adversary proceeding against the defendant, Irene K. Fronning, under section 523(a)(2) of the Bankruptcy Code, asserting that the debtor's obligations are excepted from discharge. AT & T asserts that the credit card obligations of the debtor arise from false pretenses, false representation, or actual fraud. I conclude that the debt owed to AT & T is excepted from discharge.

### *Statement of Facts*

The debtor obtained an AT & T Universal Mastercard credit card, account number 5398–7100–5464–7733, in April of 1994, by telephone. She obtained another AT & T Universal Mastercard credit card, account number 5396–4100–2083–5403, in June of 1994. The debtor and her husband had 22 other credit cards with significant balances at the time of filing bankruptcy on October 28, 1996.

*AT & T Mastercard—Account Number 5398–7100–5464–7733.*

At the beginning of February 1996, the defendant had a zero balance on this account. Between February 8, 1996, and March 15, 1996, the defendant made the following charges for purchases:

| | | |
|---|---|---|
| 2/23/96 | - | $484.64; |
| 3/12/96 | - | $97.20; |
| 3/12/96 | - | $183.75; |
| 3/12/96 | - | $643.72; |
| 3/13/96 | - | $58.28; |
| 3/13/96 | - | $140.37; and |
| 3/15/96 | - | $635.90. |

During this time period and up to the commencement of this bankruptcy case, the debtor made no payments on this account.

*AT & T Mastercard—Account Number 5396–4100–2083–5403.*

At the beginning of October, 1995, the defendant had a zero balance on this account. Between October 7, 1995 and December 18, 1995, the defendant took two cash advances and made purchases on this card as follows:

    10/30/95  -  $2,000.00 cash advance;
    10/30/95  -  $40.99 purchase;  and
    12/18/95  -  $2,100.00 cash advance.

During this time period and up to the time this bankruptcy case was filed, the debtor made three minimal payments on the account.

### Conclusions of Law

Section 523(a)(2) excepts from discharge debts which arise from false pretenses, false representation, or actual fraud.[1] The United States Supreme Court in *Field v. Mans,* 516 U.S. 59, 70 n. 8, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995) indicated that false pretenses, false representation, and actual fraud may be separate and distinct concepts. However, there is considerable blending of these concepts in reported decisional law, so it is difficult to distinguish between the elements of false pretenses, false representation, and actual fraud, except in generalities.

█ The elements of obtaining property by false pretense are: (1) a false representation or statement of a past or existing fact, (2) made by the debtor or someone instigated by the debtor, (3) made with the knowledge of its falsity, (4) made with the intent to deceive and defraud, (5) reliance on such false representation or statement, (6) an obtaining of something of value by the debtor or someone in his behalf, (7) without compensation of the person from whom it is obtained. *See* 35 C.J.S. *False Pretenses* § 6 (1960).

█ The elements of fraud have been described as: (1) the defendant made a material representation, (2) the representation was false, (3) that, when the defendant made the representation, he knew that it was false, or made it recklessly, without any knowledge of its truth, (4) that he made it with the intention that it should be acted on by the plaintiff, (5) that the plaintiff acted in reliance on it, and (6) that the plaintiff thereby suffered injury. *See* 37 C.J.S. *Fraud* § 7 (1997).

█ The elements of false representation are: (1) the individual made a false representation, (2) with fraudulent intent, (3) with the intent that the plaintiff rely on the misrepresentation, (4) the misrepresentation induces reliance, (5) the reliance is justifiable, and (6) the false representation causes damage. *See Palmacci v. Umpierrez,* 121 F.3d 781, 786 (1st Cir.1997).

█ Under these general definitions, it is clear that in each case, an essential element of the claim is reliance. The wronged party must establish that it relied upon the fraud, misrepresentation, or false pretense.

Although section 523(a)(2)(A) does not explicitly require that a creditor rely in some fashion on the debtor's false pretense, false representation, or actual fraud, the Supreme Court has made clear that some form of reliance is necessary. The Court has held that in order for a debt arising from actual fraud to be non-dischargeable under section 523(a)(2)(A), the reliance by the creditor must be justifiable. *Field v. Mans,* 516 U.S. 59, 74, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). The Court left open the question of whether a different standard of reliance is applicable for debts arising from false pretenses or false representation. *Id.* at 70 n. 8, 116 S.Ct. 437. Other forms of reliance include reliance in fact, and reasonable reliance. *See In re Ophaug,* 827 F.2d 340 (8th Cir.1987); *In re Burgess,* 955 F.2d 134 (1st Cir.1992); *In re Mullet,* 817 F.2d 677, (10th Cir.1987).

There is a conceptual difficulty in determining whether credit card charges and cash

---

**1.** Section 523(a)(2)(A) reads: A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt-(2) for money, property, services, or an extension, renewal, or refinancing of cred-it, to the extent obtained by-(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

advances are obtained by false pretenses, misrepresentation, or actual fraud. In making charges and in obtaining cash advances, the credit card holder deals with retail establishments and financial institutions other than the issuer of the card. In these transactions, the cardholder makes no actual representation to the card issuer at the time of purchase or cash advance. It is thus arguable that because no express representation by the cardholder to the issuer exists, there is no basis for a claim of misrepresentation or fraud. At common law, and today, this conceptual problem is resolved by simply implying a representation by the debtor to the card issuer that the charges or advances will be paid when due. This is a reasonable implication. The bankruptcy court must determine whether this implied representation to pay was false when made.

■ The presence of an implied representation that is false, does not end the analysis of whether discharge is barred. The issuer of the credit card must have relied upon the misrepresentation. On the facts of *Field v. Mans,* the Supreme Court required "justifiable reliance," but the meaning of this term is not clear. It is described by the Supreme Court as originating from the restatement of torts and that the concept falls somewhere between the notion of reasonable reliance and reliance in fact.

■ In the context of credit card debt, the court must determine, among other things, whether the credit card issuer relied upon the implied representation, whether the reliance was reasonable or justifiable, and whether the implied representation was false. A representation to repay the card issuer is implied as a matter of law. On the facts of this case before me, AT & T relied upon the implied representation by honoring charges made on the credit card. The issue is thus whether the reliance was justifiable or reasonable.

### Discussion

Having weighed the totality of the circumstances and considered the facts of this case, I conclude that the obligations of the debtor, Irene K. Fronning, to AT & T on the two credit cards, are excepted from discharge and shall not be discharged by any discharge order entered in this case.

The credit card charges were up to the credit card limits within the year preceding bankruptcy. During the time the credit card charges were made, the debtor and her husband, co-debtor, were in extremely poor financial condition. The debtor acknowledged in her testimony that during the time charges were made she was in "shaky" financial condition and hoping for the best.

■ The amount of money charged on the AT & T credit cards was substantial and it was excess of the debtor's ability to pay. As I stated earlier, the debtor and her co-debtor husband had, between them, in excess of 20 credit cards at the time this bankruptcy case was filed with a total credit card indebtedness in excess of $140,000.00. I conclude that at the time the AT & T credit card charges were made, the debtor, Irene K. Fronning, had no intention to repay the charges.

In reaching this conclusion, I have carefully evaluated the debtor's explanation for the credit card charges and her general assertion that she intended to repay the credit card debt. The debtor testified that the credit card purchases were used generally to pay the costs of finishing the modular home owned by her and her husband. There was testimony about the substantial costs which they incurred in connection with the construction of their home. These costs included the installation of a basement, a two-car garage, landscaping, and decks. However, this testimony was very general and not related in a specific way to the charges made on the AT & T credit cards. The debtors had in excess of 20 credit cards and there is no doubt in my mind that they made charges for the purpose of completing their modular home. However, it is clear from the record that charges were made for other purposes including living expenses.

The debtor testified that she and her husband intended to obtain permanent long term financing on their home once it was completed, and that it was their intention to payoff their credit card indebtedness from the proceeds of the long term financing. However,

there is no evidence whatsoever that the debtors obtained any loan commitment prior to incurring the credit card debt. Nor is there any evidence from which I would conclude that they had any reasonable expectation of being able to obtain permanent long term financing in a sufficient amount to pay-off the construction loan on their home and their credit card debt. Based on the evidence presented at trial, there is simply no reasonable basis for Irene Fronning to have expected that she would obtain sufficient loan proceeds to pay her credit card debt. The debtors were in a hopeless financial condition during the time period in which the charges were made to the AT & T credit cards. They had an inability to pay the credit card debts when due. They were hopelessly insolvent at the this time and they had virtually no chance of repaying the charges and cash advances they were systematically making on the AT & T credit cards.

I therefore conclude that the debtor made the charges to AT & T based on false pretenses, false representations, or actual fraud.

■ The remaining question is whether AT & T reasonably or justifiably relied upon the implied representations made by the debtor.

Mr. Lewis testified on behalf of AT & T and described the underwriting practices it followed. After an AT & T credit card is issued, the underwriting process is not terminated. On a continuing and regular basis, AT & T evaluates the creditworthiness of its cardholders and, in appropriate circumstances, terminates, limits, or modifies the lines of credit that it has issued to cardholders. AT & T has a computer automated procedure by which it periodically checks on the creditworthiness of cardholders. When it notes there has been a deterioration of creditworthiness, AT & T either terminates or limits the line of credit. Indeed, on the facts of this case, AT & T's internal procedures red-flagged the debtor's account and limited credit prior to the time the bankruptcy case was filed. I conclude that given the continuing loan underwriting practice of AT & T, it was reasonable and justifiable for AT & T to rely upon the cardholder's implied representation to pay charges when due.

The credit cards had been outstanding for nearly one and half years when the disputed charges were made, the charges were within the credit limit, and there is no evidence to suggest that AT & T was on notice of the debtor's deteriorating financial condition, before the charges were made.

### Conclusion

For the reasons stated herein, I conclude that the obligations of the debtor, Irene K. Fronning, to AT & T Universal Card Services are excepted from discharge.