In re Gale C. McVICKER, Debtor.

Sears, Roebuck & Co., Plaintiff,

v.

Gale C. McVicker, Defendant.

Bankruptcy No. 98–42405M.

United States Bankruptcy Court,
E.D. Arkansas,
Western Division.

June 15, 1999.

734

Raymond Weber, Sherwood, AR, for Debtor.

Patt Pine, Little Rock, AR, for Plaintiff.

*MEMORANDUM OPINION*

JAMES G. MIXON, Chief Judge.

This matter is before the Court upon a complaint to determine dischargeability filed by Sears, Roebuck & Company ("Sears") in the case of Gale C. McVicker ("Debtor"). After a hearing on the merits in Little Rock, Arkansas, on January 22, 1999, the Court took the case under advisement. The Court has jurisdiction over this matter as a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I) and may enter a final judgment in the case. The following shall constitute the Court's findings of

fact and conclusions of law in accordance with Federal Rule of Bankruptcy Procedure 7052.

## FACTS

The issue is whether certain prepetition charges made by the Debtor on two Sears credit card accounts are dischargeable. The Debtor was divorced in 1996 and has sole custody of her two children. She filed her voluntary petition under the provisions of chapter 7 of the United States Bankruptcy Code on May 15, 1998. She acknowledged at trial that she had signed her petition two days earlier, on May 12, 1998.

Prior to her bankruptcy filing, the Debtor opened Sears Charge Account Number 06–54058–81192–2 ("Regular Account") in October 1993 with a credit limit of $4116.00. In March 1997, she opened Sears Charge Plus Account Number 06–59509–97225–6 ("Plus Account") with a credit limit of $7228.00. The Debtor made at least minimum payments on each account through March 1998. In April 1998, the Debtor remitted a minimum payment on only the Regular Account and made no other payments on either account prior to the date of the petition. On the date of the bankruptcy filing, the Debtor owed $4093.42 on the Regular Account and $8593.97 on the Plus Account, exceeding her credit limit by more than $1000.00.

Plaintiff's Exhibits C and D are itemization reports and charge tickets that demonstrate account activity. These documents reflect that $3244.03 was charged to the Plus Account from March 19 to May 14, 1998, and $3052.94 was charged to the Regular Account from March 16 to May 14, 1998, exclusive of delayed sales that occurred before the two-month period but became due within the period.[1] More than $3000 worth of women's and children's apparel was included in the Debtor's charged purchases during this period.

Plaintiff's Exhibits C and D show that substantial amounts of merchandise were purchased and charged to the Debtor's Sears accounts on six days in 1998: March 30, April 27–29, May 4, and May 13. Additionally, purchases of clothing and other goods were charged to her accounts through catalogue and store sales on fifteen other days between mid-March and mid-May.[2]

The Debtor testified that at the time of the filing of the petition, she held three part time jobs and received child support for a total disposable income of $2500.00 a month. However, her Schedules I and J reflect a disposable monthly income of $1424.00 derived from child support and only one part time job, substitute teaching, and monthly expenses totaling $2129.59. She stated that during the two months preceding bankruptcy and on the petition date she was paying $1100.00 a month on approximately $35,000.00 in credit card debt.

Michael Gibby, a Sears store general manager, testified that during the two months preceding the bankruptcy, significant increased activity involving the Debtor's accounts occurred, with multiple charges on various days and payment default after substantial debt was incurred. He stated that Sears identified the increased activity by the end of April 1998 and responded by requiring a purchaser using the account to present supplemental identification at the time of the purchase, as a protection to the credit card holder. Store personnel implemented this "positive

---

1. These figures include any finance and late charges incurred during the relevant period minus any payments or other credits.

2. At the hearing, the Debtor denied signing some of the charge tickets evidencing purchases billed to her Regular Account during the two-month period. The Debtor alleged

that several of these charge tickets bore her former husband's signature, although he was removed from the account on March 11, 1998. On the basis of the record before it, the Court cannot state conclusively that the Debtor did not either sign or authorize the signature on the disputed tickets.

ID indicator" on May 4, 1998, and after confirming that the Debtor was in fact making the purchases on that date, removed the indicator.

Gibby further testified that before initially extending credit to the Debtor, Sears requested a credit bureau report and considered her payment history on other accounts and the total amount of revolving credit. At the time the Debtor opened each account, she agreed to pay the charges on the accounts whether made by her or by an authorized user.

After the Debtor's accounts were opened, Sears continued to monitor them, occasionally ordering subsequent credit reports. Gibby stated that Sears last reviewed the Debtor's credit history on April 1, 1998, at which time she retained a good credit rating. He testified that the Debtor had previously been consistent in making at least minimum payments on the accounts and that this was a factor in the further extension of credit.

At the close of testimony, that part of Sears' complaint alleging that the Debtor's debt to Sears was nondischargeable pursuant to 11 U.S.C.A. § 523(a)(2)(C) (West 1994 & Supp.1998) was dismissed because the luxury items charged within sixty days of the bankruptcy filing did not exceed the $1075.00 statutory limit imposed by section 523.

## DISCUSSION

The United States Bankruptcy Code provides for excepting from discharge those debts for money or an extension of credit to the extent obtained by false pretenses, false representation or actual fraud, other than a statement respecting the debtor's financial condition. 11 U.S.C. § 523(a)(2)(A) (1994). The creditor seeking to except a claim from discharge bears the burden of proof by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 291, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

To succeed in a section 523(a)(2)(A) claim, a creditor must prove five elements: (1) the debtor made a false representation or pretense; (2) the debtor knew the representation to be false at the time, or acted with reckless disregard as to its veracity; (3) the debtor intended to deceive the creditor or to induce him to act upon the representation; (4) the creditor relied upon the representation; and (5) the creditor sustained the alleged loss and damage as a proximate result of the representation.[3] *Thul v. Ophaug (In re Ophaug)*, 827 F.2d 340, 342 n. 1 (8th Cir.1987) (citing *Houtman v. Mann (In re Houtman)*, 568 F.2d 651, 655 (9th Cir.1978) (quoting *Public Fin. Corp. of Redlands v. Taylor (In re Taylor)*, 514 F.2d 1370, 1373 (9th Cir. 1975))); *Caspers v. Van Horne (In re Van Horne)*, 823 F.2d 1285, 1287 (8th Cir.1987) (citing *Friedman & Co. v. Jenkins (In re Jenkins)*, 61 B.R. 30, 39 (Bankr.D.N.D. 1986)); *FCC Nat'l Bank v. Bartlett (In re Bartlett)*, 128 B.R. 775, 779 (Bankr. W.D.Mo.1991); *Citicorp Credit Serv. v. Hinman (In re Hinman)*, 120 B.R. 1018, 1021 (Bankr.D.N.D.1990).

Applying this five-step analysis in the context of credit card debt, the element of representation is satisfied when the debtor uses the card. At that point, the debtor represents an intent to perform the unilateral contract by repaying the amount charged. *Anastas v. American Savs. Bank (In re Anastas)*, 94 F.3d 1280, 1285 (9th Cir.1996). When the card holder uses the card without an intent to repay,

---

**3.** In recently interpreting section 523(a)(2)(A), the United States Supreme Court did not rely on this five-step test but instead looked to the treatment of misrepresentation in the Restatement (Second) of Torts (1976) published shortly before Congress enacted the Bankruptcy Code. *Field v. Mans*, 516 U.S. 59, 69, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995). The five-step test heretofore employed by the Eighth Circuit Court of Appeals and the definition of misrepresentation stated in *Field* do not differ markedly except that the Supreme Court has expressly stated that the type of reliance to be proved is justifiable rather than reasonable reliance. *Field*, 516 U.S. 59, 116 S.Ct. at 446.

he has made a false representation and is aware that his representation is false. *La Capitol Fed. Credit Union v. Melancon (In re Melancon),* 223 B.R. 300, 319 (Bankr.M.D.La.1998). Therefore, a card holder incurring charges without an intent to repay has the necessary fraudulent intent that is actionable in deceit. *Anastas v. American Savs. Bank (In re Anastas),* 94 F.3d 1280, 1285 (9th Cir.1996)(quoting Restatement (Second) of Torts § 530(*l*) cmt.c (1979)). Furthermore, the fact that the debtor uses a credit card with fraudulent intent implies that he also intends to deceive the card issuer. This is so because the debtor's purpose in making the fraudulent representation is to obtain credit from the creditor even though the Debtor has no intention to repay. *In re Melancon,* 223 B.R. at 324–25.

Thus, if the creditor proves the cardholder lacks the intent to repay when charges are incurred, the creditor satisfies the first three elements in the analysis. This emphasis on a debtor's intent to pay, rather than his ability to pay, is the emerging trend in exceptions to discharge of credit card debt. *See, e.g., Rembert v. AT&T Universal Card Servs., Inc.,* 141 F.3d 277, 281 (6th Cir.1998) (reasoning that use of credit card represents either actual or implied intent to repay debt incurred) *cert. denied,* —— U.S. ——, 119 S.Ct. 438, 142 L.Ed.2d 357 (1998); *Anastas v. American Savs. Bank (In re Anastas),* 94 F.3d 1280, 1286 (9th Cir.1996) (emphasizing that the necessary representation is that the debtor has the intent to repay at the time of the credit card charge); *Chevy Chase Bank v. Kukuk (In re Kukuk),* 225 B.R. 778 (10th Cir. BAP 1998) (holding that misrepresentation includes an implied representation regarding a debtor's intent to perform under a credit card agreement when the card is used); *AT&T Universal Card Servs. v. Fronning (In re Fronning),* 222 B.R. 614, 617 (Bankr.D.Neb.1998) (recognizing that the required representation is the debtor's intent to pay the charges when due).

Because credible direct evidence of fraudulent intent is nearly impossible to adduce, courts infer lack of intent to repay by examining the circumstances surrounding the case. *Thorp Credit & Thrift Co. v. Pommerer (In re Pommerer),* 10 B.R. 935, 939, 940 (Bankr.D.Minn.1981).

Objective or circumstantial factors indicative of intent include the following: length of time between the charges and the filing of the petition, whether an attorney was consulted regarding bankruptcy before the charges were made, the number of charges made, the amount of the charges, the debtor's financial condition at the time the charges were made, whether the charges were above the credit limit, whether multiple charges were made on the same day, whether the debtor was employed at the time, the debtor's prospects for employment, the sophistication of the debtor, whether there was a sudden change in buying habits, and whether purchases were for luxuries or necessities. *Citibank v. Eashai (In re Eashai),* 87 F.3d 1082, 1087–88 (9th Cir.1996); *Citibank South Dakota v. Dougherty (In re Dougherty),* 84 B.R. 653, 657 (9th Cir. BAP 1988); *FCC Nat'l Bank v. Willis (In re Willis),* 190 B.R. 866, 868–69 (Bankr.W.D.Mo. 1996), *aff'd, FCC Nat'l Bank v. Willis,* 200 B.R. 868 (W.D.Mo.1996); *Chase Manhattan Bank v. Ford (In re Ford),* 186 B.R. 312, 320 (Bankr.N.D.Ga.1995); *Norwest Card Servs. v. Orndorff (In re Orndorff),* 162 B.R. 886, 889 (Bankr.N.D.Okla.1994); *FCC Nat'l Bank/First Card v. Friend (In re Friend),* 156 B.R. 257, 261 (Bankr. W.D.Mo.1993).

### LACK OF INTENT TO PAY

In applying these rules to the instant case, the Court finds that under the majority view, the Debtor did, in fact, make a representation of an intent to repay Sears every time she charged merchandise to her two Sears accounts between mid-March and mid-May. The first issue to resolve is whether the Debtor lacked the intent to repay those charges

despite her representation. The list of circumstantial factors showing lack of intent will serve as a guideline in discussing the Debtor's conduct as it relates to dischargeability of her debts to Sears.

As previously stated, the length of time between the petition filing and the charges Sears seeks to except from discharge spans approximately two months. The Debtor used her Regular Account to charge four purchases, including a ring, clothing and gift certificates, totaling $599.23 after she had signed her bankruptcy petition on May 12 and within two days of the petition filing date.

In the four weeks before the petition was signed, the Debtor visited Sears eight times and ordered from Sears catalogue services on at least three occasions. The evidence demonstrates charges to her two accounts for purchases of underwear, workout clothes, shoes, women's and children's apparel, gift certificates, jewelry, linens, a garbage disposer, and kitchen equipment for a total of more than $3000.00. From mid-March to mid-April, she visited the store on seven occasions when she also charged numerous purchases to her accounts.

The charges made after the Debtor had signed her petition and had obviously consulted with an attorney strongly support the inference that the Debtor had no intent to pay for those purchases. Furthermore, the charges made during the month preceding bankruptcy, especially those within the two weeks preceding the signing of the petition, also strongly suggest that the Debtor had no intent to pay for debts she was incurring because the implication is that she was contemplating bankruptcy while continuing to incur unsecured debt. While less supportive of Sears's case because further in time from the petition filing, the charges made from mid-March to mid-April remain close enough to the petition date to weigh in favor of excepting those debts from discharge as well.

Sears presented no evidence as to the exact date the Debtor consulted a bankruptcy attorney, the Debtor's prospects for employment, or the financial sophistication of the Debtor; therefore, these factors cannot be evaluated. However, through Plaintiff's Exhibit C and D, Sears painstakingly presented ample evidence of multiple charges in a single day, as well as evidence of the excessive number and amount of charges made.

The itemization reports show that on five separate days—March 30, April 27–29, and May 4—the Debtor incurred four or more charges on her account, many of which included multiple purchases such as several pairs of shoes or articles of clothing listed as a single entry on her itemization reports. Of the two months preceding the Debtor's bankruptcy, the Debtor charged to one or both of her accounts on twenty different days, or approximately one-third of the total number of days comprising the relevant period. From March 17 until May 14, the itemization reports reflect that the Debtor charged thirty-one times on her Plus Account and thirty-seven times on her Regular Account.

The Debtor's individual charges were rarely for less than one hundred dollars. Her most productive shopping days were May 13 and 14 when she spent a total of $599.23, May 4 when she spent $794.64, April 29 when her purchases totaled $940.21, April 27 when she charged $770.05 in merchandise, March 30 when the Debtor incurred charges of $576.30, and March 23 when charges on both accounts totaled $853.85.

In summary, the Debtor charged $3244.03 to the Plus Account and $3052.94 to the Regular Account in two months. These charges represent almost half the $8593.97.97 balance owed on the Plus Account at the petition date and about three-fourths of the $4093.42 balance owed on the Regular Account.

Such facts weigh heavily in favor of finding no intent to pay the debts, especially when considered with the Debtor's previous buying habits at Sears at a time when

discharging her debts was probably not yet contemplated. For example, at the beginning of 1998, some four months before bankruptcy, the Debtor owed a total balance of $3357.04, less than half the balance owed on the Plus Account upon the filing of the petition. More telling is the pattern of spending related to the Regular Account, with a balance owed of only $85.56 at the beginning of 1998 as compared with a debt of more than $4000.00 by the petition date.

Also corroborative of the Debtor's sudden change in buying habits is Gibby's testimony that the Debtor's account activity increased at such an unprecedented rate during the relevant period that Sears instituted a positive ID indicator. Therefore, her sudden change in buying habits as they relate to her two Sears accounts shows that she did not have the intent to repay.

Similarly, the Debtor's exceeding her credit limit and purchasing several luxury items in the two-month period supports Sears' contention that the Debtor did not intend to repay. Sears presented evidence that the Debtor had exceeded her credit limit on her Plus Account by more than one thousand dollars by late April and was within $22.58 of reaching the Regular Account limit on the petition date.

Although not all of the Debtor's purchases could be classified as luxuries, her accounts reflect charges for more than $500 worth of jewelry, $230 for gift certificates and $211.12 for a video cassette recorder. Moreover, the Debtor bought sixteen pairs of shoes for herself or her children during the relevant period and charged numerous articles of clothing, including items of sportswear and exercise attire that are not, strictly speaking, necessities.

The Debtor's account activity becomes even more indicative of lack of intent to repay when considered in light of her financial condition and the related issue of whether the Debtor was employed when she incurred the debts. The Debtor owed $35,000.00 in credit card debt and paid other credit card issuers a total of $1100.00 a month, nearly half her purported income for a family of three, at the time she was incurring substantial credit card debt to Sears. This admission suggests the Debtor had already begun her slide into bankruptcy when she loaded up her Sears accounts during the relevant two-month period.

While the Debtor's schedules reflect that she was working only part time as a substitute teacher, her testimony was that she held three part time jobs and earned approximately $1000 more a month than she listed on Schedule I–Current Income of Individual Debtor. The discrepancy between her schedules and her testimony undermines her credibility and suggests that she was manipulating the facts at trial to make her financial condition appear less bleak.

Moreover, even if the Court credits the Debtor's testimony as to a higher income, other facts demonstrate that the Debtor was in poor financial condition when the charges were made. For example, the Sears itemization reports reflect that the last payment the Debtor made on her Plus Account was on March 19, 1998, for $52.00. She incurred a $20.00 late charge on the account on April 22, 1998, a circumstance suggesting that, contrary to the Debtor's testimony, she failed to make a required Plus Account payment in April. On her Regular Account, the Debtor incurred a late charge of $20.00 on March 21, 1998, and made a payment of $20.00 on March 23, 1998. On April 13, 1998, she paid $15.00 on her Regular Account, the last payment received by Sears before the bankruptcy filing. In short, during the relevant period the Debtor did not make timely or required payments to Sears and paid only $87.00 toward her indebtedness while charging purchases worth more than $6000.00.

While the Debtor was incurring substantial indebtedness to Sears, her income con-

sisted of child support and part time jobs. According to her schedules, her principal job during the relevant period was substitute teaching, which is by definition an erratic source of income.

In summary, nine of the twelve circumstantial factors indicative of fraudulent intent weigh convincingly toward finding the Debtor lacked the intent to repay even though she represented that she would repay Sears when she used her two credit accounts. Because the Debtor lacked intent to repay, the Court may infer that she intended to deceive Sears by her false representation.

### JUSTIFIABLE RELIANCE

Sears must also show that it justifiably relied upon the Debtor's false representation and sustained loss as a result. Courts have found reliance exists when use of the card by the debtor forces the credit card issuer to honor its guarantee of payment to the merchant. *Citicorp Credit Servs., Inc. v. Hinman (In re Hinman)*, 120 B.R. 1018, 1022 (Bankr.D.N.D.1990); *Ohio Citizens Bank v. Satterfield (In re Satterfield)*, 25 B.R. 554, 560–61 (Bankr.N.D.Ohio 1982); *H.C. Prange Co. v. Schnore (In re Schnore)*, 13 B.R. 249, 257 (Bankr. W.D.Wis.1981).

▇▇▇ The United States Supreme Court has ruled that reliance should be justifiable, as opposed to reasonable. *Field v. Mans*, 516 U.S. 59, 116 S.Ct. 437, 445–46, 133 L.Ed.2d 351 (1995). Justifiable reliance is a subjective standard based on the qualities and characteristics of the particular plaintiff and surrounding circumstances of the case. *Field*, 516 U.S. 59, 116 S.Ct. at 444 (quoting Restatement (Second) of Torts (1976) § 545A, cmt. b (1976)). Reliance on a representation without conducting an investigation is justified as long as the falsity of the representation would not be apparent upon cursory examination. *Field*, 516 U.S. 59, 116 S.Ct. at 444 (quoting W. Prosser, Law of Torts § 108, p. 718 (4th ed.1971)).

▇▇▇ In the instant case, the representation by the Debtor of an intent to repay forced Sears to honor its promise to extend credit to the Debtor. Thus, Sears actually relied upon the representation.

▇▇▇ Furthermore, Sears was justified in relying upon the representation. Gibby testified that Sears conducted a thorough credit check when the Debtor opened her accounts and found her credit worthy. Until one month before the Debtor filed for bankruptcy, she managed to make the required minimum payments, another factor upon which Sears justifiably relied in extending credit. Sears' subsequent, periodic screening of the Debtor's credit record, including a credit check six weeks before the bankruptcy was filed, revealed no red flags that a bankruptcy loomed in the future. No facts in the instant case suggest that Sears was aware or should have been aware of the Debtor's dire financial condition and, therefore, Sears was not obligated to conduct further investigation. Thus, the Debtor managed to load up both accounts with debt in a very brief prepetition period despite Sears' vigilance.

As to the fifth and final element of actual fraud, Sears has suffered a loss as a proximate cause of having justifiably relied on the Debtor's misrepresentation. Sears has provided ample evidence that its loss is equal to the total charges to the Debtor's two accounts from mid-March to mid-May that the Debtor seeks to discharge in bankruptcy.

### CONCLUSION

When the Debtor used her charge accounts during the relevant period, she represented an intention to repay Sears. The Debtor knew the representation was false when she made it. Her purpose in making the representation was to induce Sears to extend credit when the Debtor had no intention to pay for her purchases. Sears justifiably relied to its detriment in the sums of $3244.03 charged to the Plus Account and $3052.94 charged to the Regular

Account. Therefore, a total of $6296.97 owed by the Debtor to Sears is excepted from discharge. This amount shall be reduced by the amount of any debt for merchandise that the Debtor has reaffirmed if that merchandise was charged to one of the Debtor's accounts during the relevant two-month period.

IT IS SO ORDERED.