**Glenda MESECK, Debtor.**

**Citibank South Dakota, Plaintiff,**

v.

**Glenda Meseck, Defendant.**

**Bankruptcy No. 01–00847–D. Adversary No. 01–9139–D.**

United States Bankruptcy Court, N.D. Iowa.

Oct. 7, 2002.

Mark D. Reed, Des Moines, IA, for Plaintiff.

Brian W. Peters, Dubuque, IA, for Debtor/Defendant.

## ORDER RE COMPLAINT TO DETERMINE DISCHARGEABILITY

PAUL J. KILBURG, Chief Judge.

This matter came before the undersigned for trial on September 4, 2002. Plaintiff Citibank South Dakota/Universal, N.A. was represented by attorney Mark Reed. Debtor/Defendant Glenda Leinen, formerly known as Glenda Meseck, was represented by attorney Brian Peters. After the presentation of evidence and argument, the Court took the matter under advisement. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(I).

## STATEMENT OF THE CASE

Citibank holds a claim against Debtor for credit card debt. It seeks to except its claim from discharge for fraud pursuant to 11 U.S.C. 523(a)(2)(A). Debtor denies she had the intent to defraud when she incurred the credit card charges.

## FINDINGS OF FACT

The relationship between Citibank and Debtor began in the Fall of 2000 when Debtor received unsolicited offers to open credit card accounts. Citibank is a creditor based upon credit card accounts 5424-1804-3785-4323 ("Account No. 1") and 5424-1803-1956-2416 ("Account No. 2").

Ms. Lacy Carroll, an account specialist, testified for Citibank. Citibank engages in a pre-screening process for potential account holders through a third-party. This third-party source contacts credit bureaus and compiles lists of potential customers for Citibank. Citibank then sends the qualified customers unsolicited offers to open credit card accounts. Ms. Carroll testified that Citibank contacts the credit bureaus again after the application has been received to see if the customer is still in good standing. Citibank re-evaluates the customer's standing with the credit bureaus on a monthly basis.

Debtor was employed as a full-time plant laborer at Farmland Foods, Inc. in Dennison, Iowa earning $11.40 per hour. She worked at this plant for 13 years before voluntarily terminating her employment on June 16, 2000. She moved to Dubuque, Iowa to get away from her abusive ex-husband.

Farmland Foods, Inc. operated a plant in Dubuque, Iowa which closed shortly before Debtor's relocation. Debtor felt that as an experienced laborer she would not have a problem getting a job at this plant when it reopened. She testified that she was under the impression that the Dubuque plant would reopen in the near future.

Debtor remained unemployed until the middle of August 2000. A property settlement from Debtor's divorce proceedings provided her with support while she was between jobs. As part of the divorce settlement Debtor received a 401(k) distribution on March 21, 2000 and a retirement distribution in July of 2000 from Farmland Foods, Inc. These distributions totaled $43,922.96. Debtor testified that she paid approximately $25,000 toward outstanding credit card debt. The $25,000 payment, however, was not sufficient to completely satisfy all of Debtor's outstanding credit card obligations. Debtor cured a deficiency on an automobile loan in the amount of $2,000 and cured a deficiency on her home for real estate taxes in the amount of $10,000. She stated that she spent the remainder of her retirement distribution on a wedding for her daughter which cost approximately $9,500. By August 2000, these funds were exhausted.

Debtor resumed employment in the middle of August, 2000 in a part-time position at a Pizza Hut earning $5.40 per hour. Her hourly wage was subsequently increased to $6.75 per hour after she informed her employer that she was having financial difficulties. Schedule I shows Debtor's pre-petition net monthly income from Pizza Hut as $859. Schedule J shows Debtor's pre-petition monthly expenses as $1,245. These monthly expenses do not take into account Debtor's credit card obligations which total $643.14 per month.

Debtor opened Account No. 2 in November, 2000. According to Ms. Carroll's testimony, Debtor was able to open Account No. 2 because Debtor was in good standing with the credit bureau. This account had a credit limit of $4,000. Debtor used a convenience check in the amount of $3,800 on November 13, 2000. She testified that the $3,800 convenience check was used to pay medical bills, fill the propane tank, pay OWI charges, purchase a wood stove, and pay November, December, and January's rent. Debtor testified that she wanted to pay rent in advance so that she would not have to worry about this obligation.

On November 22, 2000, Debtor made cash advances which totaled $150. These expenditures along with subsequent finance charges left Debtor with a $3998.25 balance on the account as of December 8, 2000. Late fees, additional finance charges, and a final cash advance of $40.00 on February 8, 2001 caused the account balance to exceed the credit limit. On January 8, 2001, Debtor was credited with an $83.00 payment on Account No. 2. No other payments were made on this account. At the time Citibank filed its complaint, the balance due and owing on Account No. 2 was $4,248.23.

Debtor opened Account No. 1 in December of 2000. According to Ms. Carroll's testimony, it is standard practice for Citibank to issue multiple accounts to customers. Ms Carroll testified that Debtor had remained in good standing with the credit bureau prior to Citibank issuing Account No. 1. Ms. Carroll stated that the $3,800 balance transfer made by Debtor on Account No. 2 did not raise any "red flags" since these types on transfers were common in the credit card industry. Moreover, the numerous charges made by Debtor on Account No. 2 were not unusual given the time of year.

Debtor testified that she opened this account because she thought "it would help her get some things before she got on at Farmland Foods, Inc." Debtor made twenty (20) purchases on Account No. 1 between December 19, 2000 and January 3, 2001 which totaled $1,683.56. She testified that a majority of these expenditures were for Christmas presents. On January 4, 2001, Debtor used a convenience check to draw $800 against Account No. 1 for dental bills. These expenditures along with subsequent finance charges left Debtor with a $2394.95 balance on the account as of January 12, 2001. This account had a credit limit of $2,500.

Debtor made two (2) more purchases on January 14, 2001 and January 22, 2001 which totaled $79.90. Debtor further took a cash advance of $30.00 against Account No. 1 on February 8, 2001. These expenditures and subsequent late fees caused the account balance to exceed the credit limit. Debtor has not made any payments on this account. At the time Citibank filed it's complaint, the balance due and owing on Account No. 1 was $2,663.18.

The record shows that Debtor had accepted other offers for credit cards and exceeded the credit limits on those accounts around the time she entered into the agreements with Citibank. Debtor's AT & T Universal credit card account was opened in November of 2000. Debtor made expenditures totaling $3,479.98 from November 11, 2000 to November 20, 2000 on that account. Debtor testified that a majority of these expenditures were related to Christmas presents. Debtor stated that she had a big family and that it was not unusual for her to spend this amount on Christmas presents. The credit limit on this account was $5,000. As of November 20, 2000, Debtor's AT & T account balance was $4,001.24. From November 22, 2000 to December 12, 2000 Debtor purchased additional Christmas presents and a birth stone for her daughter. These expenditures caused Debtor's balance with AT & T to increase to $4,952.76.

Moreover, the account statement from Associates National Bank shows that Debtor had a balance of $2,147.57 as of November 2, 2000. The credit limit on this account was $2,000. Debtor had an outstanding balance of $2,548.12 on her account with Bank of America as of November 7, 2000. The credit limit on this account was $2,500. On December 8, 2000 Debtor went over her credit limit on one of her two Capital One accounts. Debtor had an outstanding balance of $9,504.60 on a

Household Finance Corporation account as of November 11, 2000.

Debtor's total outstanding debt as of October 2000 was approximately $4,700. By the end of November, Debtor's debt load approximated $18,201.53. Debtor testified that she believed she would be able to cover the minimum payments on this debt as soon as she began working at Farmland Foods, Inc. In the middle of February Debtor realized she would not be able to make these payments. As such, Debtor first met with bankruptcy counsel near the end of February 2001 and filed her Chapter 7 petition on March 21, 2001.

## CONCLUSIONS OF LAW

■ Citibank asserts its claim is nondischargeable under § 523(a)(2)(A). Section 523(a)(2)(A) excepts a debt from discharge if it is obtained by "false pretenses, a false representation, or actual fraud." Five elements must be satisfied before a debt will be excepted from discharge under § 523(a)(2)(A). The elements are: (1) the debtor made false representations; (2) the debtor knew the representations were false at the time they were made; (3) the debtor made the representations with the intention and purpose of deceiving the creditor; (4) the creditor justifiably relied on the representations, *Field v. Mans*, 516 U.S. 59, 72, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995); and (5) the creditor sustained the alleged injury as a proximate result of the representations having been made. *In re Van Horne*, 823 F.2d 1285, 1287 (8th Cir. 1987).

■ Exceptions to discharge are to be narrowly construed against the objecting creditor and liberally viewed in favor of the debtor. *In re Miller*, 228 B.R. 237, 240 (Bankr.W.D.Mo.1998). Most credit card cases turn on whether the debtor misrepresented the intent to repay and whether the creditor justifiably relied on

that representation. *In re Ellingsworth*, 212 B.R. 326, 332–33 (Bankr.W.D.Mo. 1997). Universal Bank must prove the elements of § 523(a)(2)(A) by a preponderance of the evidence. *Grogan v. Garner*, 498 U.S. 279, 290, 111 S.Ct. 654, 112 L.Ed.2d 755 (1991).

## INTENT TO REPAY

■ Bankruptcy law provides that the use of a credit card constitutes an implied representation to the card issuer that the cardholder has the intention to pay the charges incurred. *In re Weiss*, 139 B.R. 928, 929 (Bankr.D.S.D.1992). Once the law implies this representation, the first three elements of the § 523(a)(2)(A) test interlock. *In re Walker*, Adv. No. 98–9117 W, slip op. at 4 (Bankr.N.D.Iowa Dec. 15, 1999). In credit card debt, the first three elements of nondischargeability for fraud are met by showing that the debtor did not have the intent to repay the charges incurred. *In re McVicker*, 234 B.R. 732, 737 (Bankr.E.D.Ark.1999).

■ "Because direct proof of intent (i.e., the debtor's state of mind) is nearly impossible to obtain, the creditor may present evidence of the surrounding circumstances from which intent may be inferred." *In re Moen*, 238 B.R. 785, 790 (8th Cir. BAP 1999). Some of the circumstances courts consider to determine intent include: (1) the length of time between the charges and the bankruptcy filing; (2) whether the debtor consulted an attorney about filing bankruptcy before the debtor made the charges; (3) the number of the charges made; (4) the amount of the charges; (5) the financial condition of the debtor at the time of the charges; (6) whether the charges exceed the limit on the account; (7) whether the debtor made multiple charges on one day; (8) whether the debtor was employed; (9) what the debtor's prospects were for employment;

(10) the debtor's financial sophistication; (11) whether there was a sudden change in the debtor's buying habits; and (12) whether the debtor purchased luxuries or necessities. *In re Pickett*, 234 B.R. 748, 755 (Bankr.W.D.Mo.1999). The factors enumerated are nonexclusive; none is dispositive, nor must a debtor's conduct satisfy a certain number in order to prove fraudulent intent. *In re Grause*, 245 B.R. 95, 101–02 (8th Cir. BAP 2000). Instead, the creditor must show that on balance, the evidence supports a finding of fraudulent intent. *Id.* at 102.

 A number of these factors are present in this case and convince this Court that Debtor did not have the intent or ability to repay Citibank. Debtor was unable to secure a job at the Farmland Foods Dubuque plant. Debtor testified that she was under the impression that the Dubuque plant was scheduled to reopen in the near future and that the plant would be in need of someone with her experience. In mid August of 2000, Debtor found replacement work of less than 40 hours per week at Pizza Hut. Debtor went from making $11.40 per hour at the Dennison plant to making $6.75 per hour.

Debtor incurred the charges to Account No. 1 and Account No. 2 at the time she was employed at Pizza Hut. She incurred nearly $20,000 in total credit card debt between November of 2000 and January of 2001. Of that amount she incurred $6,911.13 of debt on her Citibank accounts. Debtor's pre-petition net monthly income from Pizza Hut totaled $859, while her pre-petition monthly expenses totaled $1,245. These monthly expenses are underestimated in that they do not take into account Debtor's credit card obligations. Debtor could not rely on the proceeds from her 401(k) distribution and her retirement distribution because those proceeds had been exhausted as of August 2000.

It is the opinion of this Court, that Debtor's prospects for immediate employment at the Dubuque plant were less than assured at the time she moved to Dubuque. The fact that Debtor sought other employment is evidence of her uncertainty as to when the Dubuque plant would officially reopen. It is evident that Debtor incurred credit card charges at a time when she was in dire financial condition. Debtor's testimony further supports this notion. She testified that she sought a raise from Pizza Hut because she was having financial difficulties. Based on the evidence presented, this Court must conclude that Debtor's employment prospects and financial condition support the conclusion that she did not have the intent to repay.

Moreover, the record indicates that Debtor accrued more than $20,000 in total credit card charges over a period of less than five months immediately before her bankruptcy filing. Debtor exceeded the credit limit on several of her accounts, and multiple charges were made on a number of days. Debtor spent several thousand dollars on Christmas presents and prepaid her December and January rent. Although Debtor testified that she has a large family and usually spent this much on Christmas presents, these expenditures suggest Debtor deliberately "loaded up" in contemplation of bankruptcy. This Court finds that such expenditures were exorbitant given the state of Debtor's affairs.

Finally, Debtor was credited with an $83 payment on Account No. 2. No other payments were made on Account No. 1 or Account No. 2. Debtor testified that she believed she would be able to cover the minimum payments on this debt as soon as she began working at Farmland Foods, Inc. A mere profession of intent to repay, however, is not sufficient if Debtor is not

credible as to her intent. *In re Pickett*, 234 B.R. 748, 756 (Bankr.W.D.Mo.1999).

When all factors are considered, this Court is convinced that Debtor did not have the intent or ability to repay the debts she was incurring with Citibank. Thus, the first three elements of § 523(a)(2)(A) are satisfied by a preponderance of the evidence.

## JUSTIFIABLE RELIANCE

■ The Supreme Court in *Field v. Mans,* 516 U.S. 59, 72, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), held that § 523(a)(2)(A) requires justifiable reliance. The Court notes: "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case, rather than the application of a community standard of conduct to all cases." *Id.* at 70, 116 S.Ct. 437. In *In re Feld,* 203 B.R. 360, 370 (Bankr. E.D.Pa.1996), the court considered justifiable reliance in the credit card context. The court concluded that the Supreme Court in *Field* implicitly accepts as justifiable the extension of credit where the card use does not send up any red flags. *Id.* Thus, following an initial credit check that uncovers no problems, if a cardholder's use is consistent with past use, and the cardholder is paying the minimum charge and staying within credit limits, reliance on the cardholder's implied representation of intent to repay will generally be justifiable. *Id.*

■ Citibank receives lists of potential customers from a third party source. Citibank conducts the initial credit check to see if the potential customer meets Citibank's qualifications. Citibank then sends a unsolicited offer for credit to these potential customers. The record shows that a cursory look at Debtor's financial situation around the time of the credit applica-

tions would not have alerted Citibank to her increasingly dire financial condition.

According to Ms. Carroll, there were no grounds for concern about Debtor's ability and intent to repay. Not only had Debtor stated her annual income as $25,000 on the credit card applications, but Debtor remained in good standing on her credit report prior to the issuance of either account. Ms. Carroll testified that the activity on Account No. 2 would not have raised any "red flags." She stated that the $3,800 balance transfer made on Account No. 2 was a common occurrence in the credit card industry and the numerous charges were not unusual given the time of year.

According to its witness, Citibank typically checks or reviews a borrower's credit bureau scores every month while the account is open. In this instance, Debtor exceeded her credit limit in a matter of weeks. Under these circumstances, Citibank had no indication that representations made by Debtor were false or misleading and the creditor had no warning it had been deceived so that it could have made an investigation to determine the true facts.

Based on the foregoing, the Court believes that Citibank justifiably relied to its detriment on Debtor's representations when it extended the credit at issue. As such, this Court concludes that Citibank has met all the requirements of § 523(a)(2)(A).

## CONCLUSION

When the Debtor used her charge accounts during the relevant period, she represented an intention to repay Citibank. Debtor knew the representation was false when she made it. Debtor's purpose in making the representation was to induce Citibank to extend credit when she had no intention of repaying that obligation. Citi-

bank justifiably relied to its detriment in the sums of $2,663.18 charged to Account No. 1 and $4,248.23 charged to Account No. 2. Therefore, a total of $6,911.41 owed by Debtor to Citibank is excepted from discharge.

**WHEREFORE,** Plaintiff Citibank's complaint to determine dischargeability pursuant to § 523(a)(2)(A) is **GRANTED.**

**FURTHER,** Citibank has proven that Debtor intended to defraud and that it justifiably relied on misrepresentations under § 523(a)(2)(A).

**FURTHER,** judgment is entered accordingly.